## THOMAS P. WIGHT
*v.*
## AUGUST WALLBAUM *et al.*

1. JUDGMENT LIEN—*at what time it will attach.* Where the Circuit Court met on the day that a judgment was entered, and was duly opened, and, after the transaction of some business, was by the presiding judge adjourned until the next day, but there was no legal court at that term after the first day, such a judgment was valid; the day it was rendered was the last day of the term, and the lien of that judgment, against the lands of the defendants therein, attached from that day.

2. SAME—*effect of death of the judgment debtor before execution issues.* Where the judgment debtor dies after a judgment has become a lien and before execution has issued, the statute requires the execution to be stayed one year after the death of the defendant, and also requires that three months' notice shall be given to his representatives before it can be issued and proceedings had under it; and the plaintiff, in such case, does not lose his lien because an execution had not issued within a year from the date of the judgment.

3. EXECUTION—*after death of the defendant—its form.* Where a judgment debtor dies, an execution cannot be issued upon the judgment against his administrator or heirs. The better practice in such case is, to recite in the execution, the recovery of the judgment, the death of the defendant, the notice to the administrator, and then specially command the sheriff, that, of the lands owned by the defendant at his death, he levy the amount of the judgment and

Syllabus

costs. But this is only form and not material ; so, if the execution is issued in the usual form, against the defendant himself, though informal, a sale of land thereunder will be valid, and pass the title to the purchaser.

4. THE JUDGE OF A COURT *must himself be present.* The presence of the judge is indispensable to the validity of the proceedings of a Circuit Court, and he cannot authorize any ministerial officers of the court to exercise judicial powers.

5. ADJOURNMENT OF COURT—*must be by the judge.* Hence, where a Circuit Court met on the first day of a regular term, was duly opened and adjourned by the judge to the next day, and the judge then left, directing the sheriff and clerk to meet and open and adjourn court from day to day, which they did for one week, and then an order was entered declaring court adjourned until the next regular term, the court stood adjourned after the first day for want of a judge.

6. SAME—*may be to a specified day.* In such a case, the judge who opened court might have adjourned it to a specified day, had the business of the court required it, and business might have been regularly resumed at that time ; but the judge had no power to authorize the ministerial officers of the court to exercise judicial powers, even in opening and adjourning court.

7. LETTERS OF ADMINISTRATION — *irregularities in granting them — when availing.* Although the probate court may fail to observe the requirements of the law in granting letters of administration, yet, having jurisdiction of the subject and of the person, and being thereby fully empowered to act by refusing or granting such letters, a person so appointed becomes the administrator *de facto,* and the regularity of his appointment cannot be questioned in a collateral proceeding.

8. Hence, in an action of ejectment, an administrator's deed made under a decree of court, cannot be excluded as evidence because the probate court had erred in granting him letters.

9. Whether the act of granting letters of administration be a judicial or a ministerial act, the whole tenor of the legislation of this State shows that it was never designed in a proper case for the grant of letters, that any mistake as to their character should be held to render them and all acts performed by the executor or administrator, void. It must have been intended in such cases that the letters should be good, and the acts valid until they should be revoked.

10. Hence, where an administrator with the will annexed had been appointed, whether the will was properly proved or not, could not affect the validity of the letters or of a sale of the property made by the administrator.

11. IRREGULARITIES, *generally, when and how availing.* The principle is, that where a court has jurisdiction of the subject-matter and of the parties, the judgment must be held conclusive in all cases except in a direct proceeding for its reversal.

WRIT OF ERROR to the Superior Court of Chicago.

This was an action of ejectment, brought by Thomas P. Wight, to recover from August Wallbaum and others his interest in certain real estate in Cook county. He claimed to own the same as an heir and devisee of his father, John F. Wight, who died at Erie, Pennsylvania, 3d September, 1844, and was the owner thereof at the time of his death. At that time there was a judgment standing on the records of the Circuit Court of Cook county, Illinois, against Wight, in favor of James Dundas and others (who were trustees of the United States Bank) for the sum of $28,568.94 debt, to be discharged by the payment of damages in the sum of $14,665.94 and costs of suit, which judgment was entered by confession on the 23d day of August, 1844, eleven days before the death of Wight.

The records of that court show that said court met on that day, and, after doing some business, adjourned to the next day, first entering an order that the sheriff meet from day to day during the term, or until Judge Young should come and hold the court. The sheriff and clerk did so meet and adjourn until 30th August, 1844, when the court was by them declared adjourned until the next term in course. No execution was issued on the judgment during the life-time of Wight.

The first execution issued February 7, 1845, and was returned March 29, 1845, by order of plaintiff's attorney, wholly unsatisfied. A second execution was issued August 22, 1845, and returned the next day, wholly unsatisfied. A third execution was issued August 23, 1845, and returned unsatisfied August 25, 1845. A fourth execution was issued August 25, 1845, and returned September 5, 1845, in no part satisfied.

On the 10th day of May, 1845, Mr. Scammon, the attorney of the plaintiffs in that judgment, gave to J. B. F. Russell, administrator, with the will annexed, of the estate of J. F. Wight, deceased (he had been appointed such administrator about three months before), a notice, in due form, of the existence, date and amount of the judgment against Wight, and that he intended to have an execution issued upon it against the lands of said Wight, according to law; and Russell, on the same day, acknowledged the receipt of a copy of such notice.

On the 5th day of September, 1845, more than three months after the notice of the judgment had been served on Russell, another execution was issued on said judgment, and levied, on the 3d day of December, 1845, " on all the right, title and interest of John F. Wight " in " the following described," etc., being the demanded premises.

A sale under this levy was made June 24, 1847, at which Scammon bought in the property for $8,520; and, having assigned his certificate of purchase to Ogden & Robbins, and no redemption being made, a deed of the lands and lots sold was made to them March 22, 1850, and duly recorded August 5, 1850. Wallbaum, and the other defendants, derive their title through Ogden & Robbins, and insist that these proceedings vest the legal title in them.

Said defendants also claim the premises by virtue of title through an administrator's sale, and a deed made thereunder.

Wight left a will, and nominated his wife, Jane E. Wight, his brother, Jabez Wight, and George A. Elliott, all of Pennsylvania, executors. Mrs. Wight and Elliott renounced the executorship, and letters testamentary were issued to Jabez Wight by the proper authorities in Erie county, Pennsylvania. On the 11th day of February, 1845, at a Court of Probate, holden in Chicago, Cook county, Illinois, authenticated copies, or transcripts, of the will, and probate of it in Pennsylvania, were presented by J. B. F. Russell to the Court of Probate, and he was appointed administrator, with the will annexed, of of the estate of Wight in the State of Illinois, and executed the proper bond, with J. H. Collins as surety.

At the August Term, 1845, of the Cook County Court, Russell, as administrator, etc., presented a petition to the court for leave to sell the real estate left by Wight in Cook county. It was filed August 15, 1845, and was in the usual form, stating that no personal estate of the decedent had come to his hands, and, to his knowledge, there was none in the State ; that the debts amounted to $14,665.38 ; it contained a correct description of the lands to be sold, and made the widow and children of John F. Wight, deceased, parties defendant.

Notice of the filing of the petition was duly published for four successive weeks, the first publication being made on the 17th June, 1845. The notice stated that the petition would be filed on the first day of the August Term, 1845, of the Cook County Court, which was on the first Monday of August, or as soon as counsel could be heard, etc. A guardian *ad litem* for the infant heirs of Wight was duly appointed, the proper proceedings had thereon, and the usual decree of sale entered.

It appears, from an affidavit of Mr. Collins, that some papers which had been filed in the cause, among which the certificate and abstract of the debts and credits of the estate, made by the Court of Probate, were lost, and could not be found in March 1847, just after the administrator's sale. In March, 1847, the court ordered that duplicates of the missing papers should be filed *nunc pro tunc*.

On the first of May, 1847, the administrator filed in said court his report of his proceedings under the decree, showing that he duly advertised the time and place of the sale, and that on the 17th day of December, 1846, at his office on Clark street, in the city of Chicago, at twelve o'clock at noon, he sold the premises described in the petition and decree (of which the demanded premises are a part), to J. Y. Scammon, for $93.16, and that said premises were sold subject to the judgment in favor of Dundas *et al.*, against John F. Wight, deceased, dated August 23, 1843, rendered at the August Term, 1844, for $28,568.94 debt, to be discharged by the payment of $14,665.38 damages, and that he had made a deed to Scammon of the premises thus sold to him. The cause stood on the docket of the court until the October Term, 1847, when it was stricken therefrom.

Wallbaum and the other defendants derive their title through a deed from Scammon, and insist that these proceedings also vest the title in them.

The contest in the case was as to the validity of the foregoing proceedings. The jury being about to disagree, both parties, saving their rights to object to the verdict, consented that the minority should give way, and bring in a verdict in conformity

with the opinion of the majority; upon which the jury found a verdict for the defendants, and thereupon the plaintiff moved for a new trial, which was overruled, and the case was then brought to this court on his exceptions.

Mr. JOHN BORDEN, for the plaintiff in error.

Messrs. SCAMMON, McCAGG and FULLER, for the defendants in error.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

The first question arising upon this record is, whether the judgment entered in the Cook Circuit Court, on the 23d day of August, 1844, against Wight and in favor of Dundas and other parties, became a lien upon the premises in controversy. It appears that the court met on the day the judgment was entered, and was duly opened, and, after the transaction of some business, the presiding judge adjourned until the next day, and left, with the direction to the sheriff and clerk, to meet and open and adjourn the court from day to day, until Judge YOUNG should arrive. As directed, these officers did continue to meet and declare the court opened and adjourned each day, until the thirtieth day of that month, when an entry was made declaring the court adjourned until the next regular term. It also appears that Wight died on the third day of the following September. No execution was issued on the judgment before Wight's death, but the first was issued on the 7th day of February, 1845, which was returned in the ensuing month of March unsatisfied, by order of plaintiff's attorney. Between that time and the fifth day of the following September, three other executions were issued and returned unsatisfied. On the 10th day of May, 1845, plaintiffs in the judgment gave notice to Russell, who had in the mean time become administrator, with the will annexed, of the estate of Wight, of the recovery of the judgment, its date and amount, and that he would have execution issued against the lands which were owned by

Wight in his life-time, situated in Cook county. Russell indorsed on the notice an acknowledgment of its service.

On the 5th day of September, 1845, and more than three months after the notice was served, a fifth execution was issued, and was, on the third day of the following December, levied upon lands which embraced the premises in controversy. A sale was made under this levy, on the 24th of June, 1847, at which Scammon, the attorney of plaintiffs in execution, became the purchaser at $8,520. He afterward assigned his certificate of purchase to Ogden and Robbins, and, no redemption having been made, a deed was executed to them by the sheriff on the 22d day of March, 1850, which was duly recorded.

It appears from the evidence that Wight left a will at his death, by which he appointed his wife, Jabez Wight, and George A. Elliott, all of Erie, Pennsylvania, his executors. Mrs. Wight and Elliott both declined to act, and letters testamentary were granted to Jabez Wight. At the August Term, 1845, of the Cook County Court, Russell, as administrator, with the will annexed, presented a petition for the sale of the real estate in Cook county, belonging to Wight's estate, for the payment of debts. It contained the usual allegations as to the indebtedness of the estate, the want of personal assets for their payment, and a description of the lands sought to be sold, and the widow and heirs of Wight were made parties defendant. Notice of the intended application was given. On the hearing, a guardian *ad litem* was appointed for the minor defendants, and a decree was rendered licensing a sale of the lands for the purposes specified in the petition. On the 17th day of December, 1846, the administrator sold the lands, and Scammon became the purchaser at $93.16, subject to the judgment in favor of Dundas. He executed a deed to Scammon, who afterward conveyed the title thus acquired to Ogden and Robbins, on the 30th of April, 1847. It is under these sales, that defendants below derive title, and which they rely upon as a defense.

It is insisted that the Circuit Court of Cook county was not adjourned at the time of Wight's death, and the judgment against him and in favor of Dundas consequently did not

become a lien upon these lands in the life-time of Wight, and that failing to become a lien before his death it never did. Without inquiring whether a lien would attach after the death of a defendant, it is only necessary to determine whether the court did adjourn before his death. There seems to be no question that the court was regularly in session on the 23d of August, the day that the judgment was entered. And it is beyond dispute that it was regularly adjourned until the next day. After that time, regular convening and adjourning orders were entered from day to day, but no judge was present. After the 23d, for the want of a judge, no legal business could have been transacted, and for that reason the court stood adjourned. The judge who opened court might no doubt have adjourned to a specified day, had the business of the court required it, and business might have been regularly resumed at that time. The judge had no power to authorize the ministerial officers of the court to exercise judicial powers, even in opening and adjourning the court. They not having such authority, and the court not having been opened on the 24th by a judge authorized to exercise the jurisdiction of the court, it stood adjourned after the 23d, and that must be regarded as the last day of the term. And the lien of the judgment attached upon these lands from that time.

The lien having attached to the land, it could only be removed by a satisfaction of the judgment, a release by the creditor, or the efflux of time. The statute has declared (R. S. 301, § 2) that after a judgment has become a lien, and the defendant shall happen to die before execution has issued, the remedy of the plaintiff shall not be delayed or suspended by reason of the nonage of any heir of such defendant; but no execution shall issue upon such judgment, until the expiration of one year after the death of such defendant. It also declares that no other law of the State shall be so construed as to impair or affect the lien of any such judgment. The thirty-seventh section of the same act declares, in such a case, it shall not be necessary to revive the judgment by *scire facias* against the heirs or representatives of the defendant, before execution shall

issue; provided the plaintiff shall give the executor or admin-
istrator, if there be any, at least three months' notice in writing
of the existence of such judgment, before execution shall issue.

This case comes fully within these provisions. The lien
attached to the land before Wight's death; the requisite notice
was given; the execution upon which the levy was made was
not sued out until after the expiration of twelve months after
the death of Wight. This conferred the power to issue the
execution of the 5th of September, 1845, and it authorized
the sale of the premises by the sheriff.

The plaintiff did not lose his lien because an execution was
not issued within a year from the date of the judgment. The
statute has declared that if the defendant die after the judg-
ment has become a lien and before execution has been issued,
that the lien shall not be thereby impaired or affected, but
requires the execution to be stayed one year after the death
of defendant, and that three months' notice shall be given to
his representatives before it can be issued and proceedings had
under it. It cannot then be said that the lien was impaired
before the 3d day of September, 1845, which was the expira-
tion of the year after Wight's death. And previous to that
time, four executions were issued and returned, " no property
found." On the 5th day of September, 1845, one year and two
days after Wight's death, the execution was issued under
which the levy was made. This execution was issued within
one day of the earliest possible period allowed by law, and
was, we think, regular in all respects necessary to preserve
the lien.

It is likewise insisted that it was irregular to issue the execu-
tion against Wight after his death. The statute does not author-
ize an execution against the administrator, nor would it be
proper that it should, as he has no interest in the real estate
of his intestate, nor has he any control over it, for any purpose.
And, the heirs not being parties to the record, it would be
improper to issue a general execution against them, and thus
subject their property, upon which the judgment never became
a lien, to the payment of the debt of their ancestor. It would,

in such a case, be the better practice to recite the fact of the recovery of the judgment, the death of the defendant, and the notice to the administrator, and then specially command the sheriff that, of the lands owned by the defendant at his death, in his county, he levy the amount of the judgment and costs. But this is only form, and is not material, if the writ is sufficient in substance. And, although this writ was informal, it contained all that was essential, and conferred power on the sheriff to make the sale; and we have no doubt that Scammon acquired title at the sheriff's sale, and transmitted it by conveyance to his grantees.

It is insisted that the Probate Court failed to observe the requirements of the law, in granting letters of administration, with the will annexed, to Russell, on Wight's estate. The Probate Court had jurisdiction of the subject-matter and of the person, and thereby became fully empowered to act by refusing or granting such letters. When they were granted, Russell thereby became, at the least, an administrator *de facto*, and, being such, the regularity of his appointment cannot be questioned in a collateral proceeding. On an application to revoke the letters, or on an appeal from the order granting the letters, all of the objections urged against their validity would be properly considered. But they cannot be in a collateral proceeding. In the case of *Langworthy's Heirs* v. *Baker*, 23 Ill. 484, the distinction was taken between a direct and a collateral proceeding, and it was treated as a direct proceeding in that case; and on error it was held, that the law had been violated, and the letters were held to be inoperative. But it was not held that, in an action of ejectment, or other collateral proceeding, an administrator's deed, made under a decree of court, could not be read in evidence, because the Probate Court had erred in granting him letters. And the other cases referred to in our reports are in conformity to that rule.

Nor has this case any of the elements of *Cutts* v. *Hoskins*, 9 Mass. 543, as in that case letters were granted by the Probate Court of one county, while the intestate had died in another, and such action was prohibited by their statute. This was the

ground of that decision; but we can hardly doubt that a different decision would have been announced had it appeared that proof had been heard, and the Probate Court had determined that the intestate had resided in the county in which letters were granted at the time of the death of intestate. But, in the absence of such facts, the decision is unsatisfactory, and seems to be opposed to the principle that, where a court has jurisdiction of the subject-matter and of the parties, its judgment must be held conclusive in all cases, except in a direct proceeding for its reversal.

It is conceded that this was a case which authorized the granting of letters of administration; but it is urged, that, as the will was not sufficiently proved, letters with the will annexed were not authorized, and that they are void. The seventy-eighth section of the chapter regulating wills and intestate estates declares, that, when the probate justice has failed to take sufficient security, the executor or administrator shall, upon proper notice, give additional security, and, in default thereof, the letters shall be revoked, and letters of administration *de bonis non* granted; and all acts done according to law by the administrator before the letters are revoked are declared to be valid and binding. Other portions of the law have authorized the Probate Court to revoke letters when improperly granted. The seventy-first section declares, that, if letters of administration shall be granted, and a will shall afterward be found, such letters shall be revoked and repealed. The seventy-second section declares that where letters testamentary shall have been granted, and the will shall be afterward set aside, the letters shall be revoked. By the seventy-third section, the Probate Court is also authorized to revoke letters in case the executor or administrator shall become insane, lunatic, or of unsound mind, a habitual drunkard, be convicted of an infamous crime, shall waste the estate, or mismanage the same, or so act as to endanger its safety. The statute has required the probate justice of the peace to take good and sufficient security from executors and administrators; yet, so far from declaring letters issued on insufficient security void, section

seventy-eight has only authorized their revocation, and declares legal acts done under them binding.

From the whole tenor of the legislation of our State we are unable to perceive, that, whether the grant of such letters be a judicial or a ministerial act, it was ever designed that, in a proper case for the grant of letters, any mistake, as to their character, should be held to render them, and all acts performed by the executor or administrator, void. Such a policy would be attended with great inconvenience, injury and loss to estates. Persons would be deterred from becoming purchasers at sales of real and personal estate, and debtors would not know whether they could make payment with safety. It can hardly be supposed, that it was designed that, when a case had arisen, authorizing the grant of letters, whether the act be judicial or ministerial, a mistake of the officer, as to whether they should be of the ordinary character, or with the will annexed, whether to one person or to another, or as to the sufficiency of the security, should render all acts performed under them void. But it must have been intended, in such cases, that the letters should be good, and the acts valid, until they should be revoked. Then, whether the will was properly proved or not could not affect the letters until repealed, or the sale of the property by the administrator.

After a careful examination of the entire record in this case, we are unable to perceive any error for which the judgment of the court below should be reversed, and it is, therefore, affirmed.

*Judgment affirmed.*