FRANK P. HARDY

v.

JOSEPH E. DYAS, Conservator.

*Opinion filed June 16, 1903.*

1. EQUITY—*the chancellor may disregard advisory verdict.* Except where the law requires issues of fact in chancery cases to be submitted to a jury, the chancellor is not bound to follow the verdict, and in case of disagreement of the jury may enter a decree upon the evidence without re-submitting the issues to another jury.

2. APPEALS AND ERRORS—*findings of fact from oral testimony not disturbed unless error is apparent.* Findings of fact by the chancellor from oral testimony given in open court will not be disturbed on review unless error is apparent.

3. DEEDS—*when inadequacy of consideration will authorize equitable relief.* Inadequacy of consideration for a deed is ground for equitable relief if coupled with other circumstances showing oppression or undue influence, or that the grantor, through age, sickness, ignorance or mental incapacity, did not fully comprehend his act.

4. SAME—*when deed may be set aside without requiring consideration to be refunded.* If a grantee, knowing the grantor's incapacity to manage his property, pays him money which is lost or squandered, or if the grantee intended to defraud the grantor of his property, a court of equity may set aside the deed without requiring the consideration to be refunded.

APPEAL from the Circuit Court of Edgar county; the Hon. M. W. THOMPSON, Judge, presiding.

SELLAR & SHEPHERD, and NEAL & MITCHELL, for appellant:

To set aside a conveyance for inadequacy of consideration there must be an inequality so strong, gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at its inequality. 2 Am. & Eng. Ency. of Law, 701; *Howard v. Edgell,* 17 Vt. 9; *Feigley v. Feigley,* 61 Am. Dec. 375; *Watson v. Doyle,* 130 Ill. 415; *Conoway v. Sweeney,* 24 W. Va. 732.

A deed will not be set aside if the grantor has a full comprehension of the meaning and effect of his acts.

*Sands* v. *Potter*, 165 Ill. 397; *Burt* v. *Quisenberry*, 132 id. 395; *Perry* v. *Pearson*, 135 id. 218; *Willemin* v. *Dunn*, 93 id. 511; *Francis* v. *Wilkinson*, 147 id. 370; *Pickerell* v. *Morss*, 97 id. 220.

Undue influence to avoid a deed must be directly connected with the execution. The influence exercised to avoid the instrument must be of such a nature as to deprive the maker of free agency, and render his act obviously more the offspring of the will of others than of his own. *Allmon* v. *Pigg*, 82 Ill. 149; *Poe* v. *Taylor*, 45 id. 485; *Shea* v. *Murphy*, 164 id. 619; *Rutherford* v. *Morris*, 77 id. 412; *Brownfield* v. *Brownfield*, 43 id. 148; *Guild* v. *Hull*, 127 id. 532; *Conley* v. *Nailor*, 118 U. S. 133.

The practice approved by this court is to submit the question of mental capacity to a jury, and having been thus submitted, a decree should not have been rendered without a verdict. *Wyatt* v. *Walker*, 44 Ill. 485; *Brown* v. *Miner*, 128 id. 155.

If the court found the deed in this case should be set aside, it should have decreed the re-payment to appellant of the consideration paid by him. *Burnham* v. *Kidwell*, 113 Ill. 425; *Eldredge* v. *Palmer*, 185 id. 618; *Scanlan* v. *Cobb*, 85 id. 296.

DYAS & DYAS, and HENRY S. TANNER, for appellee:

Inadequacy of consideration, coupled with confidential relations, weakness of mind or financial distress, is sufficient to set aside a contract. 10 Am. & Eng. Ency. of Law, 327.

Where a grantee, with notice of his grantor's incapacity to manage his property, delivers to the latter money or property in exchange for lands, and the consideration paid is lost or wasted, or where the consideration is so inadequate as to indicate the grantee's intention to defraud, upon a bill by the grantor or his representatives to set aside the sale the grantee cannot invoke the maxim he who seeks equity must do equity, to obtain a return of the consideration. *Ronan* v. *Bluhm*, 173 Ill. 277

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery, filed in the circuit court of Edgar county by the appellee, Joseph E. Dyas, as conservator of James W. Sutherland, against the appellant, Frank P. Hardy, to set aside a deed from Sutherland to Hardy bearing date April 21, 1902, conveying to him lot 41 in Sutherland and others' addition to the city of Paris, Edgar county, Illinois, on the ground that the deed was executed without any adequate consideration, that the grantor was of unsound mind and mentally incapable of executing the same, and that the execution thereof was procured through the undue influence of Hardy over Sutherland. An answer was filed denying the inadequacy of consideration, the unsoundness of mind of Sutherland, and that the execution of the deed had been procured through the undue influence of appellant over Sutherland. A replication having been filed, the questions of the unsoundness of mind of Sutherland and the undue influence of appellant over him at the time of the execution of the deed were submitted by the court to a jury, which failed to agree, whereupon the court discharged the jury, and upon the evidence which had been heard upon the trial before the jury found that the deed was without adequate consideration, that Sutherland was mentally incapable of executing the same and that the execution thereof was procured through the undue influence of appellant over Sutherland, and entered a decree setting aside and canceling the deed, from which decree the appellant has prosecuted an appeal to this court, and has assigned as error the action of the court in refusing to again submit the questions of the mental capacity of Sutherland and the undue influence of the appellant over him to a jury, and in finding that the consideration for the deed was inadequate, that Sutherland was mentally incapable of executing the same and that its exe-

cution was procured through the undue influence of the
appellant over Sutherland, and in decreeing that the
deed be set aside without requiring the appellee, as con-
servator of Sutherland, to refund to the appellant the
amount of money paid by him to Sutherland at the time
the deed was executed.

The assignment of error that the court did not again
submit the question of the mental capacity of Suther-
land and the undue influence of appellant over him to
a jury after one jury had disagreed, but based a decree
in favor of appellee upon the testimony already heard
by the court during the trial before the jury, which had
failed to agree and had been discharged, cannot be sus-
tained, but must be overruled. In chancery cases, ex-
cept where questions of fact are required by law or the
rules of practice in courts of chancery to be submitted
to a jury, the chancellor is the judge of the weight of the
evidence and the ultimate facts established thereby. If
he submits controverted questions of fact to a jury, as
in his discretion he may do, the verdict of the jury is
advisory, only. He may adopt it or set the same aside
and re-submit the questions of fact to another jury, or
he may disregard the verdict and enter such a decree as
in his judgment equity demands. He may enter the de-
cree after setting the verdict aside, or without setting it
aside. (*Guild* v. *Hull,* 127 Ill. 523; *Stevens* v. *Shannahan,* 160
id. 330; *Maynard* v. *Richards,* 166 id. 466; *Keith* v. *Henkle-
man,* 173 id. 137.) In *Guild* v. *Hull, supra,* which was a bill
in chancery filed by Hull, as conservator, to set aside
certain conveyances made by his ward to Guild, on page
530 the court said: "In chancery cases, except in cases
where the submission to a jury is required by law or the
rules of chancery practice, the chancellor is the judge of
the weight of the evidence and of the ultimate facts es-
tablished by it. If he submits controverted questions of
fact to a jury, as he may do, the verdict or finding of the
jury is advisory, merely. He may adopt the verdict or

set the same aside and re-submit the question to a jury, or he may disregard it and enter such a decree as in his judgment equity demands. He may enter his decree after setting the verdict aside, or without setting it aside." And in *Stevens* v. *Shannahan, supra,* on page 340 it was said: "It is also insisted that the rule is that the verdict should not have been disregarded unless it was clearly and manifestly against the weight of the evidence,—so much so that it would have called for the granting of a new trial if in an action at law; and the case of *American Bible Society* v. *Price,* 115 Ill. 623, is cited as sustaining such claim. The case relied on was one of a bill contesting a will, and the authorities cited in the opinion rendered in that case (*Brownfield* v. *Brownfield,* 43 Ill. 147, *Meeker* v. *Meeker,* 75 id. 260, *Carpenter* v. *Calvert,* 83 id. 62, and *Long* v. *Long,* 107 id. 210,) were all cases of like character. The Statute of Wills (sec. 7) requires that in such cases 'an issue at law shall be made up whether the writing produced be the will of the testator or testatrix or not, which shall be tried by a jury.' But in this State the rule in respect to verdicts of juries on issues out of chancery that are not required by statute to be submitted to a jury, is, that the chancellor may either act upon such verdict or disregard it and find the issue himself, as in his opinion and judgment the weight of the evidence may justify.—*Meeker* v. *Meeker, supra; Carpenter* v. *Calvert, supra; Titcomb* v. *Vantyle,* 84 Ill. 371; *Williams* v. *Bishop,* 15 id. 553."

The second assignment of error challenges the correctness of the finding of the chancellor upon the question of fact presented by the record. More than one hundred witnesses were examined upon the trial, and their testimony as to the value of the premises conveyed, and whether Sutherland was so far under the influence of intoxicating liquors upon the morning upon which the deed was executed as to incapacitate him to make a deed, was conflicting. Upon all other questions the witnesses

substantially agreed. The witnesses were examined in open court, and when the chancellor sees and hears the witnesses while they are testifying, the rule is well settled that this court will not disturb the findings of fact unless it is apparent that error has been committed. *Fabrice* v. *Von der Brelie,* 190 Ill. 460; *VanVleet* v. *DeWitt,* 200 id. 153.

*First*—The appellant purchased the premises for $2500. This amount was paid by the appellant assuming an encumbrance of $1000 upon the property and agreeing to pay debts of Sutherland and claims against his mother's estate to the amount of $400, and by delivering to Sutherland his check for $100 upon a bank in Paris, which was cashed by Sutherland on the day he received it, and two drafts of $500 each, payable to the order of Sutherland. The witnesses fixed the value of the premises all the way from $2500 to $7000, there being great diversity of opinion as to the value thereof, as is usual in such cases. The premises contain four and one-half acres, are well located in the city of Paris and fairly well improved, and from a careful analysis of the evidence of all the witnesses who testified to the value thereof, we are satisfied the appellant purchased the property for from $1000 to $1500 less than the same was fairly worth upon the market. While the consideration agreed to be paid would not, standing alone, perhaps, authorize a court of chancery to set aside the sale for inadequacy of consideration, when taken in connection with the other facts in the case we think the fact that the appellant purchased the property at the price at which it was sold to him an important factor in determining whether the transaction should be set aside and the deed canceled. Although inadequacy of consideration, in and of itself, is not a distinct ground for equitable relief, and while, when standing alone, it is ordinarily entitled to but little weight as evidence of fraud, yet when it is coupled with other circumstances showing overreaching or oppression, or it appears that

undue influence was exerted over the grantor, or that through age, ignorance, sickness or mental incapacity the grantor did not fully comprehend his acts, or when, by the suppression of material facts or through surprise or stress of financial circumstances, he is led into an improvident bargain, equitable relief will be granted. (6 Am. & Eng. Ency. of Law, p. 699.)

*Second*—The evidence shows that Sutherland was about fifty years of age at the time the deed was executed; that he had been addicted to the excessive use of intoxicating liquors for many years; that he had had three attacks of delirium tremens within a few years prior to the execution of the deed; that he had no property whatever prior to his mother's death; that he had never been engaged in business except for a short time when he was in the saloon business, in which business he proved a failure and squandered $1500 of his mother's property within a few months; that he had been dependent upon his parents for support through the greater part of his life; that his father had been dead for several years; that he and his wife made their home with his mother, who resided upon the premises in question as her homestead; that his mother died April 19, 1902; that he had been on a protracted spree prior to her death; that he was drinking heavily on Saturday, the day of her death; that he had whisky in his possession on Sunday and Monday morning following her death and was drinking heavily, and a number of the citizens of Paris who knew him well and saw him almost daily testified he was an habitual drunkard, and, in their opinion, totally incapacitated to do business. Z. T. Baum testified: "I am mayor of Paris. I know Billy Sutherland. Have known him six to ten years. I have been his physician. I have treated him for stomach trouble and delirium tremens. I think I have treated him for delirium tremens three times in the last five years. I should say that he wasn't capable last April of transacting the ordinary affairs of

life, such as buying and selling real estate. His mental faculties have been befogged with alcohol. I would say that he wouldn't be able to transact business, except in a small way, since I have known him. By a small way I mean getting groceries, meats, etc., for the family."

T. C. McCord testified: "I am a practicing physician in Paris. I have known William Sutherland about fifteen years. I have known him intimately the last seven or eight years. He has been an habitual drunkard for the last seven or eight years. If I was going to define it professionally, I would say he was subject to chonic alcoholism. During the last two or three years I have met him sometimes every day and sometimes once or twice a week. He was generally in a maudlin drunken stupor. He was not capable of transacting ordinary business, as executing deeds, etc., last April. He wasn't capable at any time, on account of that chronic condition of being soaked with alcohol, baked brain and hard liver. He was an inebriate."

Mrs. Jane Russell testified: "I have known William Sutherland all his life. I was at Mrs. Sutherland's house when she died. I was there the day before then and the day after she died. She died about eight o'clock at night. I was an intimate friend of Mrs. Sutherland's. I was there every day for nearly three or four weeks before she died. I saw Billy when I was there. I would say that he was never sober for the three or four weeks before his mother died. He was very nervous and his voice wasn't very clear; by any means he couldn't speak distinctly. He was not there when his mother died. I told William that his mother was most gone. He turned at that and went into another room, and I heard him tell his wife he would have to go to town and get some groceries. She was trying to get him not to go, but he left. This was about six o'clock before she died at eight. I met William Sutherland and Mr. Hardy, and I spoke to him and told him that his mother was dead. He made

no reply, and I asked him if I should not telephone for Mr. Cook while I was at Mrs. Lamb's. He said, 'No, I don't want Mr. Cook.' Mr. Hardy spoke up and said, 'William, I would do that.' I went back to the house and Mr. Hardy was coming out of the door going back to town. As we were going in William was starting back with him, and Mr. Hardy says, 'You don't need to go back.' I said, 'We need you here; you must not go.' He did not go. He was quite drunk at that time. He stayed in on that night until I left. I went back Sunday morning. I think Billy was there when I went. He was drinking. I stayed until about eleven. I went back Monday morning tolerably early. Will was there at that time. He seemed to be pretty drunk. He wasn't able to dress himself. They were getting ready to go to town and he asked his wife to come and aid him; that he was too nervous and shaky to dress himself, and she went in and assisted him. He was very nervous. He was twitching. He didn't seem to be able to control himself at all. He and his wife went away. I stayed until about noon, then I went home."

Agnes Kittell testified: "I am the sister of William Sutherland's wife. I have visited them often. He was drunk all that day—the Saturday his mother died. He was drunk Sunday. He had whisky in the house and he went down town Sunday morning. He had been drinking Monday morning, the day of the funeral. He got up and was shaky and wasn't able to dress himself; went down town; wasn't able to eat any breakfast; was nervous and shaky; wasn't able to dress himself or eat anything. Jennie dressed him Sunday and Monday mornings. He wasn't able to eat any meal Sunday and no breakfast Monday morning. He left the house about fifteen minutes before his mother died. He was drinking. Mrs. Russell told him that his mother was about gone. He turned and left the house, and said he had to go to town to get some things for lunch and see Mr. Hardy. He

didn't get back until about fifteen minutes after she died. He brought back some things to eat and some whisky. He put it in his overcoat pocket. I saw it Sunday and Monday. He always had plenty of whisky. I saw him take two drinks out of a bottle Monday morning. He had been down town before that. He went down about five o'clock the first time. He had gotten some drinks while down town. While we were doing the dishes I saw him go to his overcoat and take two drinks."

The deed was executed on Monday morning at about eight o'clock, and while a number of witnesses testified that they met Sutherland on that morning in a casual way and did not notice that he was intoxicated, we think the chancellor justified, from the evidence, in finding that he was intoxicated on that morning, that he was nervous and verging on delirium tremens, and that his mental condition was such that he was not capable of executing the deed.

*Third*—The evidence showed that the appellant was a practicing attorney in the city of Paris; that he had been the duly acting conservator of Mrs. Sutherland prior to her death, for a number of years; that he knew the only property she owned was an equity in her homestead and her household goods; that he knew that William was her only son and that he was a drunkard and a spendthrift; that on the morning upon which he purchased the property, but before the deed was made, he was informed by the county judge of Edgar county that the friends of Sutherland had been to him to advise with him about the appointment of a conservator for Sutherland and that he had agreed to take the matter up on that morning; that Saturday evening after the death of Mrs. Sutherland he went to the house and arranged for William and his wife to meet him at his office at eight o'clock on the following Monday morning; that they went to his office at that time, and the deed was signed, acknowledged and recorded prior to the burial of Mrs. Sutherland, and there

is evidence in the record, which is uncontradicted, which shows that appellant stated to Sutherland and his wife that the place would have to be sold to pay his mother's debts; that saloon creditors of Sutherland would be after him; that he was his friend and would see that he was protected. Sutherland had been for many years obtaining from the appellant what funds had been used in his mother's family in the way of orders upon grocery stores and meat markets, and occasionally small sums in cash, and it was but natural that he and his wife should go to the appellant for assistance and advice after his mother was dead, and we think the evidence justified the chancellor in finding that the confidence which they reposed in the appellant was taken advantage of by him for the purpose of obtaining title to said premises.

It is next assigned as error that the court erred in canceling and setting aside the deed without requiring the appellee to return to the appellant the cash payment of $1100 made to Sutherland at the time of the execution of the deed. The appellee was appointed conservator of Sutherland on May 12, 1902, and this suit was brought by him in his representative capacity, and the record fails to show that he, as conservator or otherwise, received any part of said cash payment. The law is well settled that where a grantee has notice of the grantor's incapacity to manage his property and delivers to the latter money or property in exchange for lands, and the money or property is lost or squandered, or if it appears the grantee intended to defraud such grantor out of his property, a court of chancery may set aside the sale without requiring the consideration to be restored. In *Ronan* v. *Bluhm*, 173 Ill. 277, on page 287 it was said: "The rule which seems to commend itself to our sense of justice, and which is supported by what we conceive to be the weight of authority, is, that a completed contract of sale of lands by a grantor who is insane but has not been judicially declared insane, for a fair consideration in money

or property, to a grantee who entered into the contract without fraudulent intent and without knowledge or notice of the disability of the grantor, will not be set aside in favor of the grantor or his representatives unless the purchase price be returned or the property parted with by the grantee be restored. (*Scanlan* v. *Cobb*, 85 Ill. 296; Boswell on Insanity, secs. 413, 414.) If the grantee, with notice of the incapacity of the insane grantor to manage his estate, invests such grantor with the possession of money or property in exchange for lands, and the said money or property, by reason of the mental incapacity of the grantor, is wasted and lost, or if the grantee, with such knowledge, obtains a conveyance of the lands from such a grantor for a consideration so inadequate as to be inequitable and to evince that it was his intention to take advantage of the infirmity of the grantor and to defraud him, such a grantee would have no standing to invoke the equitable rule that 'he who asks equity must do equity,' and demand that under the operation of that maxim a court of equity should refuse to set aside the conveyance except upon the imposition of such terms as would amply protect him from any loss. Such a rule would be but to guarantee that although the attempt to fraudulently procure the property of an insane man might fail, yet the perpetrator of the attempt would be protected by law from any loss in the transaction." From the facts disclosed by the evidence we think the court did not err in setting aside said deed without requiring the return to the appellant of the amount paid by him to Sutherland at the time the deed was executed. ·

Finding no reversible error in this record the decree of the circuit court will be affirmed.

*Decree affirmed.*