**Lord C. H. E. Zeigler, Appellee, v. Illinois Trust & Savings Bank, Executor, Appellant.**

**Gen. No. 14,545.**

1. CONTRACTS—*what not wagering.* A contract providing for the rendition of professional services of a medical nature for life and the payment of compensation therefor after death of the party to whom such services are rendered, is not a wagering contract within the legal definition thereof.

2. CONTRACTS—*scrutiny of, where fiduciary relation exists.* The rule applicable to those between whom exist such relationships as lawyer and client, guardian and ward, trustee and *cestui que trust*, pastor and church member and doctor and patient, requires circumspection in searching into the *bona fides* of transactions sought to be enforced by one occupying such fiduciary relationship, against another, who was subjected to the influence arising therefrom.

3. CONTRACTS—*when set aside for undue influence and inadequacy of consideration.* If a contract is entered into between a medical adviser and his patient whose confidence he has, it will be held void if the consideration given by such adviser is inadequate and undue influence is shown.

4. CONTRACTS—*when consideration not illegal.* A valid contract made and sought to be enforced in this State calling for the rendition of medical services, is not affected by the fact that part of such services were rendered in another state contrary to law.

5. CONTRACTS—*what against public policy.* A contract calling for medical services to be rendered for life with compensation payable after the death of the patient, is void as against public policy.

6. DEPOSITIONS—*statute authorizing taking, construed.* While there is no provision in the Administration Act for the taking of depositions, still by fair and logical interpretation the act which authorizes the taking of depositions "in suits at law" and "in any suit in chancery," is sufficiently broad and comprehensive to extend to the proving of a claim against a deceased person in the Probate Court.

Contested claim in court of probate. Appeal from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the March term, 1908. Reversed with finding of fact. Opinion filed June 28, 1909.

**Statement by the Court.** The appellee, Zeigler, filed a claim in the Probate Court against the estate, which was of Mrs. Harriet G. McVicker, deceased, for $110,000, consisting of two items, one for $100,000, claimed to be due on a written contract, and one for $10,000, claimed to be due on an oral contract. The Probate Court, the Hon. Charles S. Cutting presiding, held the written contract void for reasons which will be stated in the opinion, but allowed $10,000 on the oral contract. The appellee, Zeigler, appealed to the Circuit Court, where a jury trial was had, which resulted in a verdict and judgment for $100,000, from which judgment the appellant, the executor of the last will of Mrs. McVicker, has appealed to this court. The appellee is a physician, and was licensed to practice medicine in this state January 17, 1899. He practiced osteopathy. The trial occurred in September, 1907, and Mr. Black, one of his witnesses, testified that he first met appellee in Chicago fifteen years before the trial.

The McVicker theater building is owned by a corporation, in which Mrs. McVicker, deceased, had a large interest, and April 24, 1899, Dr. Zeigler rented three rooms in the building from May 1, 1899, till April 30, 1904. The lease was signed McVicker Theatre Co., Harriet G. McVicker, president. Mrs. McVicker had

an office in the building adjoining appellee's office. Appellee commenced treating Mrs. McVicker about October 10, 1899. He treated her at his office, and afterwards, in the Lexington Hotel in Chicago, to which hotel she removed from her residence about October 1, 1900. He treated her at the Lexington Hotel until about the last of April, 1904, when the deceased went to Pasadena, California, taking Dr. Zeigler with her. She died at Pasadena August 25, 1904. Edwin L. Brand, who saw Mrs. McVicker in Pasadena, testified that she was about 80 years old. William F. Black, who saw her in Chicago before she went to California, testified that she was 81 to 83 years of age. Both of these witnesses were called by the appellee. Mrs. Lindner, called by appellee, testified that the deceased told her that she had had a contract formulated by a Mr. Janes, an old friend of hers, and Mr. Janes had provided in the contract that appellee was to get sums ranging from $3,000 to $10,000, so that he would have to wait some ten years before he would get his money, and the doctor found some objectionable features in it and refused to sign it unless modified; that the contract provided that the doctor should furnish nurses, and Mr. Janes explained to the doctor that this meant that he would have to see to the supplying of competent nurses, and had no reference to his paying them. This contract was not produced and was probably destroyed. December 19, 1899, the deceased and appellee executed a written contract, which was thus signed by Mrs. McVicker: "Mrs. J. H. McVicker." Miss Eleanor Barnet, who says she was a sort of private secretary for Mrs. McVicker in 1900 and until she went to California in April, 1904, testified that a second contract was prepared because of the signature; that "the doctor had been advised that the contract might not be good signed Mrs. J. H. McVicker."

The second contract was executed July 24, 1901, and the contract part of it, commencing with the words,

"That the party of the first part," and following a lengthy preamble, is substantially the same, except the signature, as the contract of December 19, 1899. It is as follows:

"Chicago, Illinois, July 24th, 1901.

This agreement or contract by and between Mrs. Harriet G. McVicker of Chicago, Ill., of the first part, and L. C. H. E. Zeigler, M. D., of Chicago, Ill., of the second part, Witnesseth

That the first party, Mrs. Harriet G. McVicker, first entered into this agreement or contract with Doctor Zeigler, party of the second part, on the Nineteenth day of December, Eighteen Hundred and Ninety-nine. Dec. 19th, 1899.

The original contract will be found hereto attached. A second contract was thought to be necessary because of the signature of the first and original contract being signed Mrs. J. H. McVicker instead of Mrs. Harriet G. McVicker.

That the party of the second part having been advised to have the signature changed from Mrs. J. H. McVicker to Mrs. Harriet G. McVicker, presented the first and original instrument to the party of the first part, Mrs. Harriet G. McVicker, for the purpose of getting her to consent in its being changed. On being apprised of the possibility of some legal technicality, Mrs. Harriet G. McVicker, party of the first part, immediately acquiesced and caused this the second contract to be drawn which contains the material and relevant clauses of the first and original contract drawn December 19th, 1899.

That the party of the first part, Mrs. Harriet G. McVicker, being aware that some unscrupulous persons have conspired to ruin the doctor's good reputation and business willingly and unhesitatingly causes the change in signature.

That the party of the first part, Mrs. Harriet G. McVicker, was necessitated to have Hon. William E. Hughes to call at her home and investigate the legal aspect of the terrible and cruel conspiracy against Dr. Zeigler led by Mr. L. D. Condee, Miss Jennie Boydston, Mrs. William Cox, Mr. George Graves, Mrs.

Mack, with an eye singled to have Mrs. Harriet G. Mc-Vicker, party of the first part, to discontinue the services of the party of the second part, L. C. H. E. Zeigler, M. D.

That the party of the first part, Mrs. Harriet G. McVicker, had letters presented to her purporting to be from certain individuals, which, when thoroughly scrutinized and their contents carefully questioned of Mr. L. D. Condee by Hon. William E. Hughes it was deduced by Mr. Condee's own confession that they had been forged and not written by the persons whom he at first declared had written them and delivered same in person.

To the party of the first part, Mrs. Harriet G. McVicker, to have discontinued the professional services of the party of the second part, L. C. H. E. Zeigler, M. D., would have been equivalent to the canceling of the original contract existing between first and second parties which is hereto attached, and for which result each of these persons did wrongfully cruelly conspire. Knowing this by confession from Mr. Condee, also by letter received from him, the party of the first part, Mrs. Harriet G. McVicker, for truth, justice and right has made the second contract in order to avoid the underhandedness of these unscrupulous persons.

Persons that the party of the first part have conversed with in reference to this matter, are: Mr. William E. Hughes, Rev. W. F. Black, Mr. N. E. Pearse, Mrs. N. E. Pearse, Mrs. J. I. Case, Mr. Emil Lindner, Mr. James McInerny.

## CONTRACT.

That the party of the first part, Mrs. Harriet G. McVicker, does enter into an agreement and contract for the professional services to be rendered by the party of the second part, L. C. H. E. Zeigler, M. D., at any time or place, during any spell of indisposition which I may be subjected to during the remainder of my natural life-time.

That in the event of sickness such methods are to be employed or adopted as seem best and most expedient. All medicines or other paraphernalia necessary

to the discharge of duties in cases of indisposition are to be provided by Doctor Zeigler.

That when the critical moment comes when it is thought that I may pass out, Doctor Zeigler may call the physician or physicians as his judgment may dictate.

That the sum which I voluntarily contract to pay for the services thus rendered is to be $100,000.00 (One Hundred Thousand Dollars), payable immediately or as soon as possible by my estate which I leave in trust with the Illinois Trust and Savings Bank.

In witness whereof, the parties hereto have set their hands and seals, July 24th, 1901.

Harriet G. McVicker.<br>(Burned hole.)

> United States Institute
> of Osteopathy, Chicago, Ill.
> Corporate Seal.

L. C. H. Zeigler.    (This signature written diagonally across corporate seal.)

L. C. H. Zeigler, M. D.

Emil Lindner.

(Endorsed on back thereof:)    McVicker contract.

John Janes,

L. C. H. E. Zeigler.

Rev. W. F. Black,

Mr. N. E. Pierce,

Mrs. N. E. Pierce,

Emil Lindner,

Wm. E. Hughes,

Mrs. J. I. Case,

Mr. James McInerny.''

Other evidence will be referred to in the opinion when deemed appropriate.

James C. Hutchins and Max Baird, for appellant; L. D. Condee and L. R. Atkins, of counsel.

Bulkley, Gray & More, for appellee.

MR. PRESIDING JUSTICE HOLDOM delivered the opinion of the court.

It is contended by counsel for appellant that the contract in question is void for the reason that it is a wagering contract, and also because it tends to induce crime and is consequently void as being against public policy.

In 1 Joyce on Insurance, section 148, a wager policy in respect to property is thus defined: "Wager policies are those in which the insured has no interest whatever in the subject matter insured, but only an interest in its loss or destruction."

In Guardian M. L. Ins. Co. v. Hogan, 80 Ill. 35, a son took out a policy on the life of his father, and paid the premiums. The court held that he had no insurable interest in his father's life, and say: "As said by the court in the case of Ruse v. The Mutual Benefit Life Insurance Company, 23 N. Y. 516, 'A policy obtained by a party who has no interest in the subject matter is a mere wager policy.' But policies without interest in lives are more pernicious and dangerous than any other class of wager policies, because temptations to tamper with life are more mischievous than incitements to mere pecuniary fraud."

In Benefit Ass'n v. Blue, 120 Ill. 121, this language is used: "It may be regarded as a plain proposition of law, that a wagering policy is void, and we think it also well settled that a policy taken out on the life of a third party by a beneficiary, in the continuance of whose life the beneficiary has no pecuniary interest, may be regarded as a wagering policy, and as such would be void. Had this policy been taken out by Blue on the life of Bailey, without his knowledge or consent, and had the premiums been paid by him, it would manifestly fall within what is known as a wagering policy, and would be void."

In Schreiner v. High Court of Foresters, 35 Ill. App. 576, this court, Mr. Justice MORAN delivering the opinion, said: "Public policy is a law with reference

to which all contracts must be made and interpreted, and public policy forbids that contracts shall receive such an interpretation as will encourage crime or make their performance a reward thereof. Wager policies were held void at common law because of the obvious temptation presented by such policies to the commission of crime.''

Ruse v. The Mutual Benefit Society, 23 N. Y. 516, cited with approval in Guardian M. L. Ins. Co. v. Hogan, *supra,* is a well considered and instructive case, and the court held in that case that the statute 14 George 3rd, chapter 48, prohibiting insurances on life, where the person insuring had no interest in the life, is merely declaratory of the common law.

In Warnock v. Davis, 104 U. S. 775, the court, after stating interests which would support a life policy, say: ''But in all cases there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured. Otherwise the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy.''

In Franklin L. Ins. Co. v. Hazzard, 41 Ind. 116, the suit was by the assignee of a life policy, he having no insurable interest in the life. The court held there could be no recovery, saying, among other things: ''All the objections that exist against the issuing of a policy to one upon the life of another in whose life the former has no insurable interest, seem to us to exist against his holding such policy by mere purchase and assignment from another. In either case, the holder of such policy is interested in the death, rather than the life, of the party assured. The law ought to be, and we think it clearly is, opposed to such speculations in human life.''

But we do not think the contract here is so akin to the cases of insurance referred to, as to come within the designation of a wagering contract. It will be observed that in the insurance cases there is an entire lack of contractual relationship or financial interest between the insured and the beneficiary, while in the case at bar the contractual relationship existed, and there was a sufficient consideration moving between the parties to support the contract as such. Such are the surface appearances. The enforcement of the contract depends, aside from the conditions referred to, on whether it is void as being against public policy.

It is plain from the evidence that, at the time of making the contract in question, Mrs. McVicker was 79 years of age—an old woman without children and a widow—although she was of sound mind and of testamentary capacity. It is equally clear that she was suffering from physical infirmities consequent upon her advanced age; that she had been under medical treatment for some time preceding the date of the contract, and stood in need of continuous medical treatment thereafter, and, as the sequel shows, received such treatment from Zeigler until the day of her death. While she was a woman of undoubted strength of character and firmness of purpose, it cannot be gainsaid that Zeigler had won her confidence both as a man and a physician. She believed implicitly in the honesty of his purposes and his ability as a medical man to do more for her health, in ameliorating, if not curing, her physical infirmities, than any other doctor she knew. In executing the second contract, she defended Zeigler from aspersions said to have been cast upon his character by several of his detractors. Such was not a necessary part of the contract, but was interpolated into it by Mrs. McVicker, who prepared it without the knowledge of Zeigler; yet he confirmed it by his execution of the contract. It appears that Mrs. McVicker's displeasure was readily incited when the

character of Zeigler was in any manner assailed. The evidence shows she was addicted to the use of extravagant language in praising Zeigler. The proof also demonstrates that after Mrs. McVicker fell under the influence of Zeigler she relaxed her hold upon the friendship of those persons with whom she had theretofore been acquainted, and surrounded herself, as confidants, with those persons who were admirers of and friendly to Zeigler. Such was her confidence in Zeigler that, fearing her heirs might assail the binding force of her contract with him after her death, she voluntarily, as Zeigler claims, proffered him, in certificates of deposit, the full amount called for in the contract—one hundred thousand dollars—by which act she evidenced her willingness to trust to his honor to attend her faithfully and prolong her mortal life as long as his skill and judgment and the strength of her constitution would permit. Only his alleged refusal to vary the terms of the contract by accepting the payment proffered, prevented that part of the contract from then being concluded. Whatever conclusion may be drawn from Zeigler's so refusing, it occurs to us that it is strong proof of the absolute control which he exercised over her and the unbounded confidence which she had in him, and her anxiety to protect him, even to the absolute surrender of a considerable part of her fortune. A careful weighing of the evidence furnishes no proof justifying a conclusion that Zeigler abused Mrs. McVicker's trust in him or betrayed her confidence at any time, or did not do all he was able to prolong her life, and casts no doubt upon his rectitude of purpose and action in his treatment of her. But, whatever may have been his course of conduct toward her, Zeigler's rights must be admeasured in harmony with the obligations and duties which the law exacts of persons, bearing the relationship of doctor and patient, in their dealings with each other, which relationship existed between Zeigler and Mrs. McVicker when the contract between them was made.

A fiduciary and confidential relationship between Zeigler and Mrs McVicker is clearly established. The rule applicable to those between whom exist such relationships as lawyer and client, guardian and ward, trustee and *cestui que trust,* pastor and church member and doctor and patient, requires circumspection in searching into the *bona fides* of transactions sought to be enforced by one occupying such fiduciary relationship, against another, who was subjected to the influence arising therefrom. The rule is well stated in Dowie v. Driscoll, 203 Ill. 480, where the court say: "The doctrine repeatedly announced by this court is, that courts of equity 'will scrutinize with the most jealous vigilance' transactions between parties occupying fiduciary relations toward each other  *  *  * that the burden of proof is on the beneficiary, in such cases, to establish the fairness of the transaction, and that it did not proceed from undue influence.  *  *  * In Jones v. Lloyd, 117 Ill. 597, it was held the burden of proof is upon the person obtaining the advantage, in cases of fiduciary relations, 'to vindicate the bargain or gift from any shadow of suspicion, and to show that it was perfectly fair and reasonable in every respect, and courts will scrutinize the transaction with great severity.' " Thomas v. Whitney, 186 Ill. 225.

It was held in Roby v. Colehour, 135 Ill. 300, which was a case between attorney and client, that the presumption was against the validity of a transaction between attorney and client, where the benefit inured to the attorney, and that the burden was cast upon such attorney to affirmatively show, by a preponderance of the evidence, perfect good faith, an absence of undue influence, a fair price, knowledge, intention and freedom of action on the part of the client, coupled with independent advice and full information. In treating upon this subject, Story in Vol. 1 of his work on Equity Jurisprudence, par. 314, says: "Similar considerations apply to the case of a medical adviser and his patient." This rule is recognized in Thomas v.

Whitney, *supra,* which was a case involving a contract between doctor and patient.

Applying these tests to the case in hand, we find a contract to furnish medical services, by a young osteopath practitioner (but recently graduated, whose usual and customary charge was two dollars per treatment), to an octogenarian woman in feeble health, as long as she might live, at the extravagant remuneration of one hundred thousand dollars. The contract was not drawn by a lawyer; the first contract being drafted by a Mr. Janes, an insurance agent, the supplemental contract being the same with the addition of the preamble drafted by Mrs. McVicker. Mrs. McVicker had no independent legal advice, for, while Hughes was a lawyer, he was Zeigler's lawyer, who prosecuted Zeigler's claim in the Probate Court. Janes was a fire insurance agent, and while he may have been a man of scholarly attainments, still he was not learned in the law. The evidence, however, concerning Janes's part in drawing up the contract, is, to say the least, unsatisfactory. Janes being dead, Miss Barnet testified as to what he had said to her when she went to him, at the instance of Mrs. McVicker. It borders clearly on hearsay testimony, and was therefore inadmissible. In any view, it is not convincing on the vital point of independent advice, which was intended to be established by it. How can it be said that the consideration moving from Zeigler to Mrs. McVicker was adequate, when it is too clear for argument that a woman of the advanced age and infirmity of Mrs. McVicker could have no reasonable expectation of many years of life? The observations of the Lord Chancellor in Dent v. Bennett, 4 M. & C., 269, are equally pertinent here: "As a contract, therefore, for value, the transaction is more extravagantly absurd than any that has come under my notice, and if the case rested upon that, would only require to be stated. * * * ." This case is one which comes within the ruling of Lord Thurlow, as

quoted in Coffee v. Ruffin, 44 Tenn. 487, in illustration of gross inadequacy of consideration. He said: "'It is impossible to state it to a man of common sense, without producing an exclamation of the inadequacy of it, * * * and the court will infer, from that fact alone, there must have been such imposition or oppression in the transaction as to amount to a case of fraud, from which it will not suffer any benefit or advantage to be derived.'" Hardy v. Dyas, 203 Ill. 211.

An instructive statement of the rule as to inadequacy of consideration, with citation of supporting authority, will be found in 6 Am. & Eng. Ency. of Law, 2nd ed., p. 699, note 1.

The evidence in this record is not of sufficient force to rebut the presumptions of inadequacy of consideration and undue influence, to which the law attributes contracts of the nature of that between Zeigler, the doctor, and Mrs. McVicker, his aged patient.

Zeigler was not a competent witness to testify in his own behalf, except as to his own identity and that, at the time of the execution of the contracts in suit, he was licensed to practice his calling, as shown by the state document certifying to that fact, which he produced. All of his testimony on other matters was properly excluded.

The only witness called to sustain the reasonable value of the professional services rendered by Zeigler to Mrs. McVicker, in an effort, we assume, to sustain the adequacy of the consideration in the contract, was Dr. Stewart Johnston, a medical practitioner in Chicago for twenty-one years. He had no personal knowledge in relation to the actual service rendered, and gave his testimony in response to facts stated hypothetically. He put his estimate at $90,000. But it is self evident from his testimony that he had neither knowledge nor actual experience which justified him in placing the value of Zeigler's services at any such extravagant sum. Standing alone as it does, we think

it insufficient to support so large a claim, and, furthermore, we are satisfied from the way in which the case was presented to the jury, that their verdict was founded on the contract price and not on a *quantum meruit*.

Neither Zeigler nor Mrs. McVicker was a citizen of the state of California. The contract in dispute was made between the parties to it in Illinois. The controversy in relation to it is in the forum of the state where it was made and of which the parties were residents and citizens. Zeigler was not practicing medicine in California; he was in attendance upon Mrs. McVicker, his Illinois patient, while she was temporarily sojourning in the state of California for her health. The contract is governed by the laws of this state, and even if it were conceded that Zeigler in his treatment of Mrs. McVicker, did so in violation of a statute of California, we do not regard such violation as any of the concern of our courts, or as in any way interfering with the right of recovery, providing the contract is otherwise enforceable according to the laws of this forum.

The evidence in the record fails, in our opinion, to sustain the contract as being fairly obtained, or to prove that it was entered into upon an adequate consideration, or upon full information and with independent advice.

It is, however, contended, with much plausability we admit, that Mrs. McVicker, being under no disability of law, was free to make any contract which suited her, and to be as liberal in providing for compensation as she saw fit; that to hold otherwise would violate the constitutional right of free contract; that the jury who heard the evidence must be assumed to have found in it all the necessary elements to constitute a contract good in law, meeting all the legal tests advanced in argument by appellant; that the trial judge yielded his assent to the sufficiency of the proof by entering judgment upon the verdict; and that we should not,

therefore, now interfere with conclusions so arrived at by the trial court.   But be this contention well founded or not, there still remains for our decision the question of whether a contract of this character is not contrary to public policy.

We think there is force in what the learned judge of the Probate Court said in deciding this case when it was before him for primary determination, viz: "The relation of physician and patient is necessarily the most intimate and confidential character.   This relation presupposes an enfeebled condition of one party and a control of that party by the other.   As the end of life approaches the desire for health and strength does not diminish, and the patient will be strongly tempted to promise anything if even the hope of recovery seems possible through the aid of the medical adviser.   Contracts so made must be closely scrutinized, especially where, as in this case, the reward of the physician would be hastened and his labor decreased by the speedy death of his patient.   A contract which puts the absolute control of a patient in the hands of one who will greatly profit by her speedy death, is, no matter how honest and reliable the physician may be, of doubtful expediency, and should be condemned as against public policy."

While we have examined many authorities which hold to this rule, and have not found any case squarely in point, holding a contract of the nature of the one before us void as against public policy, where a good and valuable consideration appears from the contract to have moved between the parties, yet we think all the circumstances of this case bring this contract so clearly within the principle of this rule as to make it controlling in its condemnation.

At the time of the making of this contract, Mrs. McVicker was an octogenarian and an invalid for many years.   It is assumed, in the hypothetical question put to the medical expert witness of appellee, that Mrs. McVicker had for many years been treated by physi-

cians for bladder trouble of thirty or forty years'·
standing, inflammation of the knee joints, hemorrhoids
and mal-assimilation of her food, and that her diges-
tion was so badly affected that the food she consumed
needed special preparation; that subsequent to mak-
ing the contract Zeigler performed an operation upon
her and removed a polypus from her uterus, and that
she suffered from other physical ills. It is therefore
patent that when the contract was made her health
was so enfeebled as to raise the presumption of law
that she was under the control of Zeigler when she exe-
cuted the contract. The fact that Zeigler did not
practice any artifices or exert any undue influence to
induce Mrs. McVicker to enter into the contract, and
did nothing when treating her to shorten her life, does
not lend any palliation to his position before the law
in attempting to enforce the contract against her es-
tate or relieve the contract from the imputation which
the law casts upon it of being contrary to public pol-
icy and therefore void. The policy of the law is not to
sanction the putting of a party in a position where he
is subject to the temptation to do wrong in serving
his own interests, which, as in the case at bar, is to
hasten death rather than to prolong life. It cannot be
gainsaid but that the early demise of Mrs. McVicker
was to the financial interest of Zeigler, for on the hap-
pening of that event, if the contract should be upheld,
he would be entitled to receive from her estate the
sum of one hundred thousand dollars, the compensa-
tion stipulated in the contract.

We think the principle plainly stated by the English
vice chancellor in Dent v. Bennett, *supra*, which to-
gether with the language used in characterizing the il-
legality of the contract, are equally applicable here, and
that the law and the logic of that case are controlling.
While it is apparent that the cause went off finally in
the chancery court upon the theory that it was not a
cause cognizable in equity, as all defenses insisted
upon were available in bar of an action at law, never-

theless the vice chancellor did decide that the defense that the contract was void as against public policy could be successfully urged at law because the contract was void for that reason, and that the whole question, being upon the construction of the contract, was one of law for the court. Such being the condition, we are unable to escape its force as applicable to the case in hand. It is peculiarly applicable in its similarity to the Zeigler-McVicker contract. There, as here, the contract was between doctor and an octogenarian patient; the compensation was extravagantly large; no suspicion of mal-treatment of the patient by the doctor existed; the patient, as here, lived several years after the making of the contract, and died after attaining to a ripe old age; and the compensation was also payable upon the death of the patient. In commenting upon the illegality of the Dent-Bennett contract, the vice chancellor said: "In my opinion, however, as the case now stands, nothing can be more useless than to allow the action to proceed, for it is plain on the face of the agreement itself, that it is not worth one farthing in point of law." After stating the terms of the agreement, the vice chancellor proceeded to remark: "It is plain that the existence of such an agreement is a direct premium to the medical adviser to accelerate that death upon the happening of which he is to have 25,000 pounds, and it is in vain to say that in fact it did happen that the party who was to give the 25,000 pounds did live for four or five years after the agreement. You must look at the agreement as it stood at the time when it was made; and it must be admitted that the human mind is so constituted, as that this agreement might be a temptation to some persons to do the very thing which it is obvious, it was the duty of the party who took the agreement not to do; and my deliberate opinion is, that it is totally void in point of law for that reason." Cole v. Gower, 6 East. 110, is to a like effect. In this case the guardians of the poor compromised with Gower, the putative father of

an illegitimate child, for his liability for support for 20 pounds, while the statute required the guardians to take security for the bastard's support. The note given for the money was held void as against public policy, and Lord Ellenborough, in giving judgment for the maker of the note, indulged in these observations: "It is a shocking consideration that by means of such security as this the parish officers, who have a public duty imposed upon them, to take care that the father shall make a proper provision for the maintenance of the child, acquire an interest that the child should live as short a time as possible." And the associate of Lord Ellenborough, in concurring in the latter's judgment, said: "They cannot, therefore, convert a power, given them for the mere purpose of indemnity, into a matter of bargain and speculation upon the life and death of the child, thereby making it to the interest of the parish to get rid of the child as soon as possible. * * * Parish officers ought to pursue the statute and not lay a wager in effect upon the continuance of the child's life. The ban of the law against contracts which hold out a temptation to the party beneficially interested to shorten the life of another, has received an interpretation as applied to life insurance policies which is distinct and aside from the wagering features of such policies. This is obvious from the remarks of the court in Ruse v. M. B. L. I. Co., 23 N. Y. 516, where it is said: "Such policies if valid not only afford facilities for a demoralizing system of gaming, but furnish strong temptations to the party interested to bring about, if possible, the event insured against. * * * But policies without interest upon lives are more pernicious and dangerous than any other class of wager policies, because temptations to tamper with life are more mischievous than incitements to mere pecuniary frauds." The last paragraph recited was quoted in the opinion of our own Supreme Court in Guardian v. Hogan, *supra.* Chicago G. F. L. S. v. Dyon, 79 Ill. App. 100.

The temptation of such a beneficiary to shorten life is well illustrated in N. Y. M. L. I. Co. v. Armstrong, 117 U. S. 591, Burt v. U. C. L. I. Co., 187 U. S. 362, and Ritter v. M. L. I. Co., 169 *ibid.* 139, in which the lives of all the persons insured were ended by foul means. Contracts which have a tendency to incite the commission of a crime of any character are void as against public policy. Such in effect is the doctrine of Gillett v. Logan Co., 67 Ill. 256, which involved the procuring of evidence of illegal voting, and the court say: "But the contracts themselves are pernicious in their nature. * * * A strong temptation was held out to them to make use of improper means to procure the needful testimony to secure the desired result of the suit. The nature of the agreement was such as to encourage attempts to suborn witnesses, to tamper with juries, and to make use of other 'base appliances' in order to secure the necessary results, which were to bring to these agents their stipulated compensation. * * * In Marshall v. Baltimore & Ohio R. R. Co., 16 How. 314, it was held that a contract for a contingent compensation for obtaining legislation, was void by the policy of the law. With much greater reason, we think, should the contracts under consideration be held vicious. We cannot sanction them. On account of their corrupting tendency, we must hold them to be void, as inconsistent with public policy." Goodrich v. Tenney, 144 Ill. 422. We are therefore constrained to hold that the contracts sued upon are void as being contrary to sound public policy, and that consequently no recovery can be predicated upon such contracts.

The case was submitted to the jury, under instructions of the court, given at the instance of appellee, on the right of appellee to recover under the contract of December 19, 1899, and July 24, 1901, and not on a *quantum meruit* for services rendered. These contracts being void for the reasons already given, the trial judge erred in not giving the twelfth instruction

asked by appellant, in these words: "The jury are instructed that the claimant is not entitled to recover upon either of the written contracts offered in evidence on his behalf." Under such condition the rights of appellee are restricted to those enforceable under the contracts.

The only material point remaining to be disposed of relates to the admissibility of the depositions read in evidence by appellee. We think they were admissible. They were taken while the cause was pending in the Probate Court, and while it is true there is no provision in the Administration Act for the taking of depositions, still we think that, by fair and logical interpretation, the act which authorizes the taking of depositions "in suits at law" and "in any suit in chancery" is sufficiently broad and comprehensive to extend to the proving of a claim against the estate of a deceased person in the Probate Court, whose jurisdiction in the trial of such claims partakes of the quality of both "law" and "chancery" wherever the principles of either can be invoked for the attainment of justice. Moreover, appellant was in attendance by counsel and had an opportunity to cross-examine, and is consequently precluded from challenging the admission of the evidence contained in these depositions. The trial in the Circuit Court was *de novo,* and in that court the depositions were admissible as evidence, beyond cavil.

The judgment of the Circuit Court is wrong, and it is therefore reversed with a finding of fact.

*Reversed with finding of fact.*