JOHN FECHT, Appellant, *vs.* GUS T. FREEMAN *et al.* Appellees.

*Opinion filed June 20, 1911—Rehearing denied October 11, 1911.*

1. COURTS—*county courts are not courts of inferior jurisdiction.* County courts are courts of limited but not inferior jurisdiction, and, when adjudicating upon the class of questions over which they have general jurisdiction, as liberal intendments will be indulged in their favor as will be extended to the proceedings of circuit courts.

2. SAME—*county court's appointment of conservator cannot be collaterally attacked.* County courts have jurisdiction to appoint conservators for insane persons and jurisdiction over their persons and estates after a conservator has been appointed, and the question whether a particular county court has jurisdiction over a particular estate is one of fact, which is conclusively settled by the judgment of the county court, and its order appointing a conservator cannot be collaterally attacked in the circuit court.

3. CONSERVATORS—*a conservator's appointment cannot be questioned in proceeding begun by him in circuit court.* Whether the insane person was a resident of the county when the conservator was appointed and whether he was induced to come into the county for the purpose of serving process upon him are questions which the county court has power to consider and determine in making the appointment, and they cannot be re-litigated in the circuit court in a proceeding instituted by the conservator to set aside certain deeds made by his ward.

4. INSANE PERSONS—*rule where parties deal with insane person.* One who trades property with an insane person in good faith and without knowledge of the insanity should be placed *in statu quo* by requiring the money paid by him to the insane person to be returned before the transaction is set aside; but if he does not deal in good faith but with an intention to defraud, and knew, or should have known, of the insanity, the transaction may be set aside without requiring him to be reimbursed for the money paid over.

5. SAME—*when transaction will be set aside without requiring return of consideration.* A transaction whereby an insane person exchanged a farm worth $12,500 for $1250 cash, some worthless shares of mining stock and a house and lot encumbered for more than it was worth, will be set aside at the suit of his conservator without requiring the return of the consideration if it is lost or squandered, where the evidence is convincing that the insane person was obviously a physical and mental wreck and that the other parties knowingly used his condition to advance their own interests.

APPEAL from the Circuit Court of Champaign county; the Hon. SOLON PHILBRICK, Judge, presiding.

H. I. GREEN, and O. B. DOBBINS, for appellant.

LEFORGEE, VAIL, & MILLER, for appellees.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed in the circuit court of Champaign county by John Fecht, by his conservator, against Gus T. Freeman and Alice J. Freeman, his wife, to set aside a deed to the east half of the south-east quarter of section 25, in township 20, north, range 10, east of the third principal meridian, in Champaign county, Illinois, executed by John Fecht to Gus T. Freeman on May 4, 1908, and recorded in the recorder's office of the said county on May 5, 1908, and for other relief. An answer and replication were filed, and the case was referred to a special master to take the proofs and report his conclusions. The master took the proofs, and after overruling objections thereto filed a report, finding as follows:

(1) That the court had jurisdiction of the parties and subject matter.

(2) That the equities of the cause are with the complainant.

(3) That John Fecht was on the 4th day of May, 1908, at the time of the transaction mentioned in said bill of complaint, and for several years previous thereto, and still is, a person of unsound mind and not capable of taking charge of his property and affairs; that from childhood up, his mental ability has been so weak and undeveloped that he has been the creature of mere suggestion, and was so addicted to the use of intoxicating liquor that he would dispose of any of his effects and property without any consideration for their real value, in order to get a little money with which to purchase intoxicating liquor.

(4) That Henry Johnson was duly and regularly appointed conservator for the estate of the said John Fecht by a court of competent jurisdiction, and qualified as such prior to beginning this action.

(5) That on the 4th day of May, 1908, the said John Fecht was the owner of the following described real estate: The east half of the south-east quarter of section 25, township 20, north, range 10, east of the third principal meridian, Champaign county, Illinois, subject to a mortgage indebtedness of $500 to the Trevett-Mattis Banking Company of Champaign, Illinois, said mortgage for $500 bearing date of March 2, 1906, and due in five years thereafter, with interest at five per cent per annum, which said land he received as the heir and devisee of his father, Martin H. Fecht, who departed this life on or about the 19th day of January, 1906, leaving a last will and testament devising the above described land to his son, John Fecht, which said will was duly probated in the county court of Champaign county, Illinois, and that the land so owned by John Fecht was of the fair cash market value of $13,000.

(7) That on the 4th day of May, 1908, the said John Fecht made a deed to said land conveying the same to the defendant Gus T. Freeman.

(8) That the defendants, Gus T. Freeman and Alice J. Freeman, are husband and wife.

(9) That the defendant Gus T. Freeman, on the 4th day of May, 1908, was possessed of certificates of 58,466 shares of stock in the Lewis and Clark Gold Mining Company of Grant's Pass, Oregon, which certificates represented the shares of stock to be of the value of one dollar each.

(10) That said gold mine had been abandoned long previous to May 4, 1908, and the shares of stock were not of the value of one dollar each, nor of any market value whatever, and were not worth the paper they were written upon, and the defendant Gus T. Freeman had knowledge of the same.

(11) That Alice J. Freeman, on the 4th day of May, 1908, was the owner of lot 7 of S. H. Busey's third addition to the city of Urbana, Illinois, Champaign county, upon which lot was located a house.

(12) That on the 4th day of May, 1908, the fair cash market value of said house and lot was $3000.

(13) That on the 4th day of May, 1908, the said Alice J. Freeman, with Gus T. Freeman, her husband, executed a mortgage upon said lot 7 of S. H. Busey's third addition to the city of Urbana, Illinois, for $3500, to George W. Busey, trustee for M. W. Busey, said mortgage purporting to secure one note of even date therewith for the principal sum of $3500, bearing interest at six per cent per annum, payable semi-annually, and due one year after date thereof, and the acknowledgment bearing date of May 1, 1908, being made and executed on the 4th day of May, 1908, and dated back by said defendants and filed for record on the 5th day of May, 1908, and the consideration for the same being paid on the 5th day of May, 1908, and the said mortgage was for $500 more than the fair cash market value of said property.

(14) That the said John Fecht, under the direction of one J. F. Geddes, of the city of Danville, came to the office of said Gus T. Freeman, in the city of Urbana, in company with and was introduced by one Robert Swift to Gus T. Freeman on or about the first day of May, 1908, and at said time the defendant Gus T. Freeman, in accordance with a previous arrangement with the said J. F. Geddes, of Danville, Illinois, made a proposition to John Fecht to trade for his eighty acres of land described, giving said John Fecht for said land the house and lot above described of the defendant Alice J. Freeman, together with the certificates of shares of the gold mining stock in possession of the defendant Gus T. Freeman and about $1000 in cash.

(15) That at that time the said John Fecht was of unsound mind and was not capable of taking charge of his

property, and had not the mental ability to understand the nature and extent of such a transaction, and had not the mental ability to understand the value of the said eighty acres of land above described which he at that time owned, and that the enfeebled mental condition of the said John Fecht was of such an extent and character and so manifest that any person could observe the same in a few minutes' conversation with him, and that the mind of the said John Fecht was so manifestly weak that he would follow the suggestion of any person who would offer him or give him a small amount of money.

(16) That on the 4th day of May, 1908, again in company with one Robert Swift, the said John Fecht came from the office of J. F. Geddes, in the city of Danville, to the said city of Urbana, to the office of the defendant Gus T. Freeman, who thereupon took him to the office of one L. B. Saffer, in said city of Urbana, and consummated with said John Fecht a trade, the said John Fecht conveying, by a warranty deed to Gus T. Freeman, the eighty acres of land so owned by him, namely, the east half of the southeast quarter of section 25, in township 20, north, range 10, east of the third principal meridian, in Champaign county, Illinois, subject to a mortgage of $500 thereon to the Trevett-Mattis Banking Company, and said Gus T. Freeman gave to the said John Fecht for said real estate a warranty deed made and executed by Alice J. Freeman and Gus T. Freeman, her husband, for lot 7 of S. H. Busey's third addition to the city of Urbana, Illinois, subject to a mortgage, (which mortgage, by the terms of the deed, the said John Fecht assumed and agreed to pay,) certificates of 58,466 shares of stock in the Lewis and Clark Gold Mining Company of Grant's Pass, Oregon, and $1250 in cash.

(17) That at the time the said trade was made the said John Fecht was so weak mentally that he did not understand the nature and extent of the trade in which he was entering, and that said defendants, Gus T. Freeman

and Alice J. Freeman, together with the agents that were working for the said defendants, knew, or by the exercise of reasonable care could have known, of his weak mental condition at said time.

(18) That the said will of Martin H. Fecht by which the said John Fecht received title to the eighty acres of land in question, contained a clause as follows: "With this provision, that he shall not sell or dispose of the said land until he shall have reached the age of forty-five years," which provision the said Gus T. Freeman knew and concerning which he consulted with attorneys previous to the time of making any arrangements with the said John Fecht concerning the said trade, and the said Gus T. Freeman knew that the said John Fecht at the time was of about twenty-five years of age, which provision, together with the age of the said John Fecht, should have put the defendant Gus T. Freeman upon his inquiry as to the mental capacity of John Fecht.

(19) That the defendant Alice J. Freeman, on the 4th day of May, 1908, knew that the fair cash market value of lot 7 in S. H. Busey's third addition to the city of Urbana did not exceed $3000, and that she, together with her husband, at the time of the trade in question executed a mortgage upon said property for $3500, which the said Alice J. Freeman and her husband knew was far in excess of the fair cash market value of said property, and the defendants, Alice J. Freeman and Gus T. Freeman, knew that the price asked in said trade, with the encumbrance upon said property of $3500, was so grossly inadequate that they were constructively conspiring to defraud and take advantage of the enfeebled mental condition of John Fecht in said trade, by causing the said John Fecht, by the terms of said trade, to assume and agree to pay said mortgage of $3500.

(20) That the reasonable fair cash market value of the eighty acres of land so conveyed by John Fecht to Gus T. Freeman was $12,000, and that the reasonable fair cash

market value of the house and lot conveyed by Alice J. Freeman to John Fecht was $3000, subject to a mortgage of $3500, which John Fecht assumed and agreed to pay; that the fair cash market value of the gold mining stock was not anything, and that the only thing that John Fecht received for his eighty acres of land was a check for $1250.

(21) That the defendant Gus T. Freeman in this trade acted for himself and as agent for his wife, Alice J. Freeman, and that, acting for himself and as such agent, he did fraudulently, maliciously and unlawfully take advantage of the enfeebled mental condition of said John Fecht, and did make said trade for the purpose of defrauding and cheating said John Fecht out of his land and property.

(22) That a decree should be entered in this court that the deed from the said John Fecht to Gus T. Freeman be canceled and declared null and void, and the defendants be required to cause to be conveyed to said John Fecht the said premises conveyed by the said John Fecht to said Gus T. Freeman, and that the said John Fecht be required to convey to the said Alice J. Freeman the title to the house and lot conveyed by said Alice J. Freeman to the said John Fecht, and the said John Fecht be released from the agreement to pay the mortgage placed upon said house and lot by the said Alice J. Freeman, and John Fecht return, with proper assignment, the certificates of the gold mining stock secured from Gus T. Freeman.

(23) That the said John Fecht, by reason of his mental incapacity, has wasted and lost the $1250 paid to him in said trade by the defendant Gus T. Freeman, and that the defendants had knowledge of the mental incapacity of the said John Fecht, and by making use of said mental incapacity obtained the conveyance of land in question from said John Fecht for a consideration so inadequate as to be inequitable, and to evince that it was the intention of the defendants to take advantage of the infirmity of the said John Fecht and to defraud him, and that the said John

Fecht should not be required to return to the defendants the $1250 which was paid to him in the consideration of said trade.

The objections filed with the master were renewed as exceptions in the circuit court, and were sustained as to findings Nos. 2, 3, 4, 15, 18, 19, 21 and 23, and the court prepared in lieu thereof findings as follows:

That John Fecht was devised by the will of his father, Martin H. Fecht, (which will was duly admitted to probate and recorded in the records of Champaign county,) the east half of the south-east quarter of section 25, township 20, north, range 10, east of the third principal meridian, in Champaign county; that the provisions of said will restricting the alienation of this property by the said John Fecht until he should arrive at the age of forty-five is void and of no effect. The court further finds that by the will of said Martin H. Fecht he made John Fecht co-executor with his brother, and that from and after the death of the said Martin H. Fecht the said John Fecht managed and controlled his own property, and was permitted so to do and recognized as capable of so doing by his said father by said will, and that from that time until the time of the alleged appointment of a conservator the aforesaid John Fecht did transact all his business matters, dealt in business ways and had the control of his property and the use and expenditures of the same with the general public as an ordinary person and was so treated by persons who so dealt with him; that the said John Fecht was treated and dealt with by persons who had business relations with him during said time as ordinarily capable of doing such business as they were transacting with him. The court further finds that there was no conspiracy entered into by said Gus T. Freeman or Alice J. Freeman with any person whatever, for the purpose of defrauding or cheating the said John Fecht out of his property. The court further finds that prior to the time of a trade entered into by and be-

tween Gus T. Freeman and John Fecht the said John Fecht had been endeavoring through various parties to borrow money upon the land so owned by him, and that by reason of the clause of the will of the said Martin H. Fecht in attempting to prevent the alienation of the said premises, parties from whom said loan was sought to be obtained declined to make the same. The court further finds that having failed to obtain said loan the said John Fecht then determined to dispose of, sell and convey his said premises regardless of their value, and entered into negotiations by which the said sale was consummated and the said property purchased by defendant Gus T. Freeman; that prior to the time of the said purchase the said Gus T. Freeman knew nothing of the mental condition or mental capacity or ability to transact business of the said John Fecht, and that there was nothing whatever at that time or in the transaction that gave him any reason to believe or suspect that the said John Fecht did not know or understand the value of the property he owned or the value of the property that he was receiving from Gus T. Freeman, except the fact that he made no investigation whatever of the value of the shares of gold stock which he was receiving as a part consideration for the said trade. The court further finds that at the time of the said trade the said John Fecht was not mentally capable of transacting, understanding or protecting himself in the trade which he then consummated, and that the said Gus T. Freeman having had no notice or knowledge of the condition of the said John Fecht, the trade so consummated and made was one which was not void but only voidable. The court further finds that at the time of the alleged appointment of Henry Johnson as conservator of the estate of John Fecht, and at the time of the institution of said proceedings, and for a considerable time prior thereto, the said John Fecht was not a resident of the county of Champaign, State of Illinois; that he at that time resided in the city of Danville, county of Vermil-

ion, State of Illinois; that he was then engaged in business in said city in said Vermilion county, had voted at an election prior thereto and had become a resident of that county. The court further finds that for the purpose of securing the appointment of a conservator by the county court of Champaign county the said John Fecht was illegally and fraudulently brought within the jurisdiction of Champaign county, where service was had upon him in said proceedings, and that the said John Fecht was not at that time a resident of the said Champaign county, and that the bringing of the said John Fecht within the jurisdiction of said county court of said Champaign county and of service of process upon him in that county did not give the county court of Champaign county jurisdiction or authorize it to appoint a conservator for said John Fecht, and that by reason of the failure of the said county court of Champaign county to have jurisdiction to make the said appointment the alleged appointment of the conservator of John Fecht as herein set forth in the bill of complaint is not sustained, and that there was no legally appointed conservator of said John Fecht, and that the plaintiff herein is not authorized to and cannot maintain this action. It is therefore ordered that a decree be entered dismissing the bill, and it is ordered that the bill be and is hereby dismissed at the cost of the estate of John Fecht, without prejudice.

Thereupon the court entered a decree dismissing the bill at the cost of the estate of John Fecht, without prejudice, and John Fecht, by his conservator, has prosecuted an appeal to this court.

The findings of the master that John Fecht was incompetent to make the deed and that the same should be set aside for that reason were all approved, and the court, by its rulings upon the exceptions, disagreed with the master on the following propositions, only: First, that the conservator of John Fecht was duly appointed by the county court of Champaign county; and second, that Gus T. Free-

man did not act in good faith in dealing with said John Fecht and without notice that he was incompetent to make said deed, and that the same should be set aside without reimbursing Gus T. Freeman for the cash payment which he made John Fecht at the time said deed was made and delivered.

This record is voluminous, but there is but little conflict in the evidence as to the material facts. Martin H. Fecht, a widower, and his sons, John and Harm Fecht, resided upon a one hundred and sixty acre farm in Champaign county, where Martin H. Fecht died in 1906, testate, leaving the said farm clear of encumbrance, which was of the value of about $28,000, and possessed of about $10,000 worth of personal property. By his will he gave to John the real estate in controversy and $6000 in money and the balance of his estate to his son Harm Fecht, and appointed his sons as executors. The will was admitted to probate, and within one year thereafter John came into possession of the eighty acres of land devised to him and of $6000 in cash. The family physician, Dr. McKinney, who had treated the family for many years, testified that Mrs. Fecht was insane for many years prior to her death and that Martin H. Fecht was demented and a dipsomaniac; that he only knew two things,—one to acquire land and keep it, and the other to drink whisky,—and that he died of delirium tremens and pneumonia while living alone with his sons and surrounded by the most filthy conditions he ever witnessed. Dr. Walker testified to the same conditions, and they both agreed the condition of his parents and the conditions under which he was raised affected materially the physical and mental growth of John Fecht. Two score or more of the neighbors of the Fecht family testified that John Fecht from his infancy was mentally weak, bordering on imbecility; that he could not learn at school, and that as he has grown older his mental deficiencies and weaknesses increased and were more apparent; that for some

years prior to the execution of the deed now sought to be set aside he was drunk substantially all the time if he could obtain liquor, and that within eighteen months after he had received the $6000 in cash from his father's estate he had squandered every cent of that amount, together with the rents of the farm, and had encumbered the land for $500, which had gone in the same way.   Dr. McKinney testified that John Fecht was a masturbater, and that when John was about eighteen years old he attempted self-castration, and that when the witness, in company with Dr. Walker, arrived at the Fecht home he found John covered with blood, his testicles partially severed and his private parts covered with wood ashes and wrapped in filthy rags, and his only excuse for the act given to the physicians was that his father had been castrating pigs in the forenoon, and as he was no good he concluded to treat himself in the same manner.   On another occasion he called upon Dr. Harris in the evening and desired medical treatment.   The doctor, on examination, found he had small-pox, and directed him to go immediately to his home, in company with another debauchee who was with him, and remain there until he (the doctor) should arrive.   John inquired of the doctor if small-pox was a serious matter.   The doctor explained to him the nature of the disease and he went away.   On the arrival of the doctor at the farm he was unable to find him, but in a short time he arrived in company with his friend and stated they had been to a neighbor's to get breakfast. After his father's death he made his home with his brother, who was married and who had more mentality than John. For a year or two after the death of his father John tried to farm, but with no success.   He surrounded himself with drunken characters and neglected the farm.   He then went into the implement business in a small village near his home, but that only lasted three months, when it was closed out.   During the time he was conducting the implement business complaint was made to the town supervisor that

he was constantly drunk, that he slept in barns and was a general nuisance to the neighborhood, and a request was made that he be cared for. He then purchased a restaurant in Danville, which he carried on for a few days and then abandoned. He afterwards purchased a second-hand clothing business in Danville, which seems to have been soon converted into a drinking place and a resort for lewd characters. The witnesses, with the exception of Freeman, a lawyer by the name of Saffer, (who claimed his privilege on the ground he closed the deal for Freeman,) a real estate agent from Danville by the name of Geddes, and one Swift, a hanger-on at the office of Geddes, who helped Freeman engineer the trade whereby Freeman got the deed to the land in controversy, all testified that no rational person could converse with John Fecht for but the briefest period and upon the simplest subjects without discovering that he was weak-minded and unable to do business. John Fecht was small in stature, and the witnesses generally spoke of him as a boy, although he was twenty-five years of age, and said he talked like a boy six or eight years old instead of like a man; that if he had money in his possession, regardless of the amount, he soon parted with it, and that he often begged for food from house to house, and asked people with whom he was acquainted for money with which to buy something to eat.

The foregoing facts clearly, we think, establish that the master and chancellor were justified in finding that John Fecht was wholly unable to take care of himself or to protect his property, especially as against Freeman and the men who were acting with him in their endeavor to get the farm from John Fecht. The eighty acres owned by John Fecht were valued at about $175 per acre and were found by the master to be worth $13,000. The eighty acres received by his brother were worth about $15,000, and John was given $2000 more of the personal property than his brother to equalize the two eighties of land. John had

mortgaged his eighty for $500, so that his equity therein on May 4, 1908,—the date of the deed,—was worth $12,500. For that eighty acres John Fecht received from Freeman a house and lot in the city of Urbana, which the master and chancellor found was worth $3000 and which for the purpose of the trade was encumbered by Freeman for $3500, which encumbrance John Fecht assumed and agreed to pay; 58,466 shares of mining stock, of the par value of one dollar per share, in a defunct mining company of which Freeman was president and which stock was absolutely worthless, and a check for $1250, which check was cashed by John Fecht and the proceeds given away, lost or squandered within a few days. It is therefore clear from the foregoing figures, which are taken from the testimony of Freeman, that Fecht did not receive from Freeman to exceed $1250 for the equity in a farm that was worth $12,500.

The first question, in law, which arises on this record is, could the appointment of a conservator of John Fecht by the county court of Champaign county be attacked collaterally in this proceeding? We are of the opinion it could not. The county courts of this State are created by the constitution, and while they are courts of limited jurisdiction they are not courts of inferior jurisdiction, and when adjudicating upon the class of questions over which they have general jurisdiction, as liberal intendments will be indulged in their favor as will be extended to the proceedings of the circuit courts. The county courts of this State have jurisdiction to appoint conservators of insane and distracted persons, spendthrifts, etc., and jurisdiction over their persons and estates after a conservator has been appointed, and the question whether a particular county court has jurisdiction of a particular estate is a question of fact to be determined by that court, and when that question is once determined by the county court its judgment is conclusive and cannot be questioned by the circuit court in a collateral proceeding. (*Bostwick* v. *Skinner*, 80

Ill. 147.) In this case a petition was filed in the county court of Champaign county for the appointment of a conservator of John Fecht on the ground that he was insane and unable to care for his property. A summons was issued and served upon John Fecht in Champaign county by the sheriff of that county. A guardian *ad litem* was appointed by the court to represent the defendant, who appeared by attorney. A jury was selected, which after a trial found that John Fecht was a resident of Champaign county, was insane and that a conservator should be appointed of his person and estate, and thereupon the court entered judgment upon the verdict and thereafter appointed Henry Johnson as conservator of John Fecht. He duly qualified and thereupon filed this bill. Henry Johnson, however, died during the pendency of this suit, and William H. Wheat was appointed by the county court of Champaign county in his stead as conservator of John Fecht and qualified, and was by order of the circuit court substituted as complainant instead of Henry Johnson and has prosecuted this appeal on behalf of his ward.

But two reasons are urged why the appointment of a conservator of John Fecht by the county court of Champaign county was not regular: First, that John Fecht was a resident of Vermilion county, and not of Champaign county, at the time the proceedings to appoint a conservator were commenced; and second, that John Fecht was induced to come into Champaign county from Vermilion county, before the conservator had been appointed, in order that process might be served upon him. These were questions that the county court of Champaign county had the power to consider and determine,—that is, that court might rightfully determine for itself whether it had jurisdiction of the person of John Fecht, and the court having determined these questions and proceeded to hear the cause, its determination thereon was conclusive of those questions and its judgment in that regard could not be reviewed by

the circuit court in this proceeding, which is a proceeding collateral to the proceeding in the county court for the appointment of a conservator.

The authorities in this State are all one way upon the question that the county courts of this State, in the appointment of guardians, administrators and conservators, are judges of their own jurisdiction. In *Dodge* v. *Cole,* 97 Ill. 338, which was a proceeding in chancery by a conservator to set aside a fraudulent conveyance, where it was contended the county court which made the appointment did not have jurisdiction to make the appointment by reason of the fact that the insane person was not a resident of the county in which the appointment was made, the court, on page 351 of the opinion, said: "It is claimed, in the first place, that the proceedings in the DeWitt circuit court in which Maria Sharp was adjudged an insane person and John H. Lisk was appointed her conservator are null and void for the reason it does not appear that there was personal service on her, and that therefore Lisk had no right or authority, as conservator, to make application for a sale of the land or to sell the same under the directions of the court; that his appointment being void, his action in the premises must be regarded as that of a mere stranger; and in support of this position *Eddy* v. *People,* 15 Ill. 386, is cited and relied on. It is sufficient to say with respect to this question, that we are of opinion that the validity of Lisk's appointment as conservator cannot be inquired into in a collateral proceeding like the present. It is the settled doctrine of this court that the regularity or validity of an administrator's appointment cannot be questioned collaterally, (*Wight* v. *Wallbaum,* 39 Ill. 554; *Duffin* v. *Abbott,* 48 id. 18;) and on principle we can see no difference in the case of a conservator and an administrator."

In the late case of *Balsewicz* v. *Chicago, Burlington and Quincy Railroad Co.* 240 Ill. 238, an administrator was appointed in Bureau county and a suit for damages was com-

menced by the administrator so appointed, in that county. The defendant offered in evidence a release made by a prior administrator who had been appointed by the probate court of Cook county, and it was sought to prove in that case that the appointment in Cook county was void, for want of jurisdiction. This court held otherwise, and on page 246 of the opinion said: "The probate court of Cook county has general jurisdiction of the settlement of the estates of deceased persons, and, when adjudicating upon questions arising in such matters, as liberal intendments are to be made in favor of its findings as of those of courts of general jurisdiction. (*Bostwick* v. *Skinner,* 80 Ill. 147; *Blair* v. *Sennott,* 134 id. 78.) Residence of the deceased, at the time of his death, within the territorial jurisdiction of the court is essential to give the probate court jurisdiction to grant administration of his estate. But the probate court having general jurisdiction of the subject matter of the settlement of estates, if such court has assumed jurisdiction of a particular estate and granted administration thereof, then, in accordance with the rule in regard to the acts of courts of general jurisdiction that all intendments of law are in favor of such acts and that they are presumed to have jurisdiction to give the judgments they render until the contrary appears, such grant of administration is conclusive and not subject to attack in a collateral proceeding. (*Wight* v. *Wallbaum,* 39 Ill. 554; *Schnell* v. *City of Chicago,* 38 id. 382; *Hobson* v. *Ewan,* 62 id. 146; *Bostwick* v. *Skinner, supra.*) In these cases the question did not arise precisely as it does here. The case of *Bolton* v. *Schriever,* 135 N. Y. 65, however, presents the question as it arises here, and it was there held that the fact that the decedent was not at the time of his death a resident of the county in which administration of his estate was had does not authorize a collateral attack upon the acts of the administrator. While there are decisions to the contrary, the decided weight of authority is in favor of the proposition that the

appointment of an administrator by a court of general probate jurisdiction is valid against collateral attack on the ground that the decedent was not a resident of the county. *Kling* v. *Connell,* 105 Ala. 590; *Irwin* v. *Scriber,* 18 Cal. 499; *Eller* v. *Richardson,* 89 Tenn. 575; *Railway Co.* v. *Mahoney,* id. 311; *Jordan* v. *Chicago and Northwestern Railway Co.* 125 Wis. 581; *Comstock* v. *Crawford,* 3 Wall. 396; *Grignon's Lessee* v. *Astor,* 2 How. 319."

Numerous other cases might be cited covering the foregoing proposition, but the law is so well settled upon the subject in this State that we deem it unnecessary to quote further from the cases. The following cases substantiate the doctrine that a bill in a case like this is collateral to the appointment of a conservator by the county court, and that the circuit court, in a proceeding like this, is powerless to inquire into the validity of the appointment of such conservator or to review the judgment of the county court upon that subject: *Propst* v. *Meadows,* 13 Ill. 157; *Matthews* v. *Hoff,* 113 id. 90; *Blair* v. *Sennott,* 134 id. 78; *Bradley* v. *Drone,* 187 id. 175.

If, however, the circuit court did have jurisdiction to review the action of the county court of Champaign county in a proceeding like this, to appoint a conservator of John Fecht, the evidence found in this record shows that John Fecht was a resident of Champaign county. His home was with his brother on the home farm, and the fact that he was temporarily in Danville, or that he voted at an election held in that city six months after the conservator had been appointed in Champaign county, did not establish, or tend to establish, that he was a resident of Vermilion county at the time he was adjudged to be insane in Champaign county, and the fact that after it was discovered that John Fecht had traded his farm to Freeman for a house and lot in Urbana, (which was encumbered for more than it was worth,) for worthless mining stock and a small amount of money, two of the citizens of Champaign county

went to Vermilion county, where they found him penniless
and induced him to return to Champaign county, and after
he returned to his home set in motion proceedings for
the appointment of a conservator and for the recovery of
his farm, did not deprive the county court of Champaign
county of jurisdiction to determine the question of his in-
sanity, upon a proper petition being filed in that court and
service of summons had upon John Fecht in said county.
Regardless of the motives of the persons who were instru-
mental in inducing him to return to Champaign county, the
persons who induced him to return to Champaign county
did not control the litigation in the county court and are
not connected in any way with this litigation. No fraud or
duress was practiced upon John Fecht or used against him
to induce him to return to his home. After his return,
and after the facts had been made known to him that the
house and lot for which he held a deed was encumbered
for more than it was worth and that the mining stock was
worthless, he expressed a desire to get his farm back be-
fore the proceedings for the appointment of a conservator
were commenced, and if he desired to leave Champaign
county he had an opportunity to do so before summons
was served upon him. But, as we have heretofore seen,
the facts herein last above referred to are immaterial in
this case, and presumably were before the county court at
the time the proceedings for the appointment of a conser-
vator were heard in that court and were determined by that
court adversely to the contention of the appellees in this
court. The judgment of the county court was not suscept-
ible to collateral attack in this proceeding in the circuit
court, and the facts have only been referred to by reason
of the importance given them by the decree entered in the
circuit court and the briefs filed by appellees in this court.

The other question presented for our consideration is,
should the decree which will be directed to be entered in
this case on its remandment require that Gus T. Freeman

be reimbursed the $1250 which it is said he paid to John Fecht at the time he procured a deed from Fecht for his farm, as a condition precedent to the entering of a decree setting aside said deed?

The law is well settled that if Freeman traded for the farm of John Fecht in good faith and had no knowledge of the fact that John Fecht was insane or incompetent to do business, the deed ought not to be set aside without placing Freeman *in statu quo* by returning to him the entire consideration which he paid to John Fecht. On the contrary, if Freeman did not deal with John Fecht in good faith but intended to cheat him out of his farm, and knew, or should have known, that John Fecht was mentally incapable of making the trade whereby Freeman acquired the farm, then the deed should be set aside without Freeman being placed *in statu quo* by having returned to him the $1250 which he says was paid in cash to John Fecht at the time the trade was made. Three weeks after the deed was made and the $1250 paid to Fecht, according to the testimony of Freeman, the conservator, Henry Johnson, went to Danville and found John Fecht scrubbing out a saloon, being entirely destitute of funds and without means of support. The $1250, if paid to Fecht, soon disappeared, as no trace of it has ever been found. The facts surrounding the deal between John Fecht and Gus T. Freeman are, that John Fecht was in Danville engaged in running "a second-hand clothing store," for which he had agreed to pay the witness Swift $650, and which store Swift testified was paying from $8 to $10 per day, and that one day the profits were $52.80; that John Fecht had no money and wanted to borrow money on his farm, which was then encumbered for $500; that he went to Geddes to make a loan; that Geddes promised to go to Urbana and borrow the money; that he went to Urbana, saw Freeman and left the abstract of title with him but did not negotiate a loan; that Freeman soon telephoned Geddes he could not make the loan as the title

was not good, although he had obtained the opinion, in writing, of a reputable lawyer in said city that it was good, and it is now conceded it was good; that Geddes stated over the 'phone that his client must have money and would trade the farm; that Freeman then proposed to Geddes to trade the Urbana property and the mining stock for the farm and pay a small amount of money, and then stated to Geddes, although he knew Geddes was representing John Fecht, that if he could get the deal through he would pay him well for so doing, and after the deal was closed he did pay Geddes $200; that Geddes then sent John Fecht to Urbana, with Swift, to see Freeman, and although at that time John Fecht was running a second-hand store (according to the testimony of Swift) which was paying from $8 to $10 per day, and one day had paid $52.80, neither John Fecht nor Swift had any money with which to pay street car fare to Urbana and Geddes advanced it; that on their arrival in Urbana John Fecht was shown the house and lot in Urbana and told it was worth $4500, and was taken to the secretary of the mining company and was told by Freeman that the mining stock might be worth a million dollars; that after some delay the trade was made by John Fecht conveying his farm to Gus T. Freeman, which was worth $12,500 over and above the mortgage, and Freeman caused his wife, in whom the title rested to the Urbana property, to mortgage the same for $3500 to her brother-in-law, date the mortgage back and have it acknowledged before Saffer, a notary public, as of May 1 when it was made on May 4, and then conveyed the property to John Fecht subject to the mortgage, which John Fecht assumed and agreed to pay, and assigned and delivered to John Fecht 58,466 shares of the Lewis and Clark Gold Mining Company of Grant's Pass, Oregon, which he knew to be worthless, and drew his check for $1250. The deed for the farm was delivered to Gus T. Freeman and recorded the next morning, but the deed to the house and lot, the

shares of stock and the check were put up with the brother-in-law, to hold for John Fecht until a quit-claim deed could be procured from Harm Fecht, as the attorney who had given Freeman an opinion, in writing, upon the title to the farm, before he had any interest in the farm and before he talked of the trade with John Fecht, stated that while the title was good he would suggest a quit-claim deed be obtained from Harm Fecht. · Harm Fecht would not sign a quit-claim deed, and the point was then waived and the deed, stock and check were on the 6th day of May delivered to John Fecht, and within·a few days Gus T. Freeman and wife conveyed the farm to S. D. Taylor without consideration, and, as Freeman admitted before the master under the advice of his lawyer, for the purpose of preventing John Fecht from recovering back the farm. Taylor was made a party to this suit, but he refused to hold the title and conveyed it back to Freeman, and the suit was then dismissed as to Taylor.

The inadequacy of consideration for the transfer of said farm from John Fecht to Gus T. Freeman is so great as to shock the conscience of a court of equity and stamp the whole transaction with fraud from its inception to its close, and the evidence is convincing and well nigh conclusive that John Fecht was the victim of Geddes and Freeman. The cash payment of $1250 paid to John Fecht was immediately squandered by him, lost or given away, and within three weeks after he had been introduced to Freeman by Geddes and had conveyed his farm to Freeman, he was scrubbing out saloons in Danville with a view to getting a drink and a morsel of food, and was sleeping in the office of Geddes in the city of Danville, which he swore was his place of residence at the time he voted in Danville, in November, 1908. The evidence is convincing that John Fecht was a wreck, mentally and physically, and that no sane man,—especially one like Freeman,—could meet him and talk with him without discovering at once he was lack-

ing in mental capacity to transact ordinary business; and the fact that he was willing to exchange a valuable farm for a piece of property encumbered for far more than it was worth and for mining stock which was entirely worthless, in order that he might be able to get a few dollars into his possession with which to buy drinks, should have at once aroused the suspicion of Freeman. Freeman also knew, according to his own testimony, that Geddes had been employed, as he said, by John Fecht to get a loan on his farm for $1500, and he immediately proposed to pay Geddes well, and did subsequently pay him $200, to assist him in engineering the mining stock deal, whereby he acquired title, substantially without other consideration, to a valuable farm.

In the case of *Hardy* v. *Dyas,* 203 Ill. 211, on page 221, it was said: "The law is well settled that where a grantee has notice of the grantor's incapacity to manage his property and delivers to the latter money or property in exchange for lands, and the money or property is lost or squandered, or if it appears the grantee intended to defraud such grantor out of his property, a court of chancery may set aside the sale without requiring the consideration to be restored." Clearly, this case falls within the rule there announced.

In *Ronan* v. *Bluhm,* 173 Ill. 277, on page 287, it was said: "The rule which seems to commend itself to our sense of justice, and which is supported by what we conceive to be the weight of authority, is, that a completed contract of sale of lands by a grantor who is insane but has not been judicially declared insane, for a fair consideration in money or property, to a grantee who entered into the contract without fraudulent intent and without knowledge or notice of the disability of the grantor, will not be set aside in favor of the grantor or his representatives unless the purchase price be returned or the property parted with by the grantee be restored. (*Scanlan* v. *Cobb,* 85 Ill.

296; Boswell on Insanity, secs. 413, 414.) If the grantee, with notice of the incapacity of the insane grantor to manage his estate, invests such grantor with the possession of money or property in exchange for lands, and the said money or property, by reason of the mental incapacity of the grantor, is wasted and lost, or if the grantee, with such knowledge, obtains a conveyance of the lands from such a grantor for a consideration so inadequate as to be inequitable and to evince that it was his intention to take advantage of the infirmity of the grantor and to defraud him, such a grantee would have no standing to invoke the equitable rule that 'he who asks equity must do equity,' and demand that under the operation of that maxim a court of equity should refuse to set aside the conveyance except upon the imposition of such terms as would amply protect him from any loss. Such a rule would be but to guarantee that although the attempt to fraudulently procure the property of an insane man might fail, yet the perpetrator of the attempt would be protected by law from any loss in the transaction."

The decree of the circuit court will be reversed and the cause will be remanded to that court, with directions to enter a decree setting aside the deed from John Fecht to Gus T. Freeman, bearing date of May 4, 1908, for the east half of the south-east quarter of section 25, township 20, north, range 10, east of the third principal meridian, Champaign county, Illinois; also the deed from Alice J. Freeman and Gus T. Freeman to John Fecht for the house and lot conveyed by them to him, situated in the city of Urbana, and releasing John Fecht from his agreement to pay the said $3500 mortgage, and that the conservator of John Fecht, if he has the mining stock in his possession which was delivered to John Fecht by Gus T. Freeman, return said mining stock to Gus T. Freeman. If, however, said mining stock was lost or destroyed by John Fecht and never came into the possession of the said conservator, the

same need not be returned or the value thereof accounted for, and that the relief ordered to be granted to John Fecht be granted without the re-payment to Gus T. Freeman of the $1250 paid by him to John Fecht at the time the trade was consummated.

*Reversed and remanded, with directions.*