(No. 23152.—

SARAH EDNA PAGE, Appellee, *vs.* WILLIAM C. KEEVES *et al.* Appellants.

*Opinion filed December 16, 1935.*

FRANCIS A. HARPER, for appellants.

JOHN K. NEWHALL, and DAVID B. GIVLER, for appellee.

Mr. JUSTICE HERRICK delivered the opinion of the court:

Sarah Edna Page, appellee herein, filed her bill on December 4, 1933, in the circuit court of Kane county, to set aside a conveyance of her residence property in Aurora (hereinafter called Page property) made by her to William C. Keeves and Mabel C. Keeves, husband and wife, as joint tenants, in exchange for a business property (hereinafter called Golden property) located at the corner of Galena boulevard and Lake street, in Aurora, on the ground of fraud and deceit practiced upon her by certain of the defendants and by reason of which she was induced to make conveyance of her property. The defendants to the bill were Keeves and his wife, the Merchants National Bank of Aurora, M. J. Lareau, William Alcott, William J. Golden and his wife, and Agnes M. Burns. The bill alleges that the Page property had, subsequent to its transfer, been placed on the market at a distressed and inadequate price and sold under contract to the defendant Agnes M. Burns for $4426.58; that the complainant had elected to rescind the conveyance made by her and offered and agreed to convey all the title to the Golden property she received, to her grantors or to whomsoever the court might find were equitably entitled thereto. No point is made as to the sufficiency of the bill to support the decree and its further allegations will not be recited here. Upon issues joined, a hearing was had in open court before the chancellor, which resulted in a decree for the complainant, finding the defendants Lareau, Alcott, Golden and Keeves guilty of fraud; found Agnes M. Burns had entered into the contract with the Keeves in good faith; ordered re-conveyance of the Page property to the complainant, subject to the rights of Agnes M. Burns under her contract of purchase, and that

Lareau, Alcott and William J. Golden pay to the complainant $2573.44. The bill was dismissed as to the Merchants National Bank. The cause comes here for review upon appeal by Lareau, Alcott, Keeves and wife and Golden and wife. Mrs. Page died after the decree was entered and her legal representatives have been substituted in this court.

The errors assigned and argued may be grouped under a single head, viz., that the decree is not supported by the law or the evidence.

Sarah Edna Page was a widow. Her husband died about eleven years prior to the trial of the cause in the court below. No descendants survived them. The Page property was the home of Mrs. Page and her husband from about 1889 until his death, after which she continued to live there until the early part of 1933, when she moved to the Leland Hotel, in Aurora. Her husband left her sufficient property to provide amply for her under economic conditions as they existed at his death. At the time of the conveyance of her home she was eighty-one years of age and was without business experience, her husband in his lifetime having solely managed their business affairs. After his death her brother took care of her business matters until his death, in 1929. In 1930 she placed her securities and the management and transaction of her business with the Merchants National Bank, evidenced by a written agreement under which the bank acted generally for her until a short time prior to the filing of the present bill. During this period her account was frequently overdrawn. The bank on occasion sold some of the securities without her direct consent, in order to take care of overdrafts and to meet her other requirements. Among the securities delivered to the bank was a group of five or six bonds aggregating a face value of $25,000 to $30,000, secured by trust deeds on buildings in Chicago. All these were in default in 1930-1931. C. D. Knight was the trust officer of the bank and as such in charge of Mrs. Page's

business. He was called as a witness for the defendants and testified that he discussed her financial condition with Mrs. Page and advised the sale of the bonds in default. She directed them sold in January, 1931, but at that time there was practically no market, and, in so far as the record discloses, no sale thereof was ever made. Knight stated he recommended that she sell some of her jewelry rather than some of her good securities, but she had not done so; that he advised her to sell her home, but no satisfactory arrangement had been made about the disposition of it, and he then told her to quit paying taxes thereon, and approved the idea of using what sound securities she had remaining for the purpose of buying her a place in an old ladies' home. All these conversations and conferences were prior to the transaction by which she conveyed her home, as hereinafter stated.

Lareau and Alcott were realtors living in Aurora. Mrs. Page was acquainted with Alcott but had never met Lareau prior to the time of meeting him at her hotel in February or March of 1933. Mrs. Page testified as a witness in her own behalf. While her testimony is not very clear and explicit as to what occurred in her different interviews with the defendants Lareau and Alcott, yet we are unable to see any effort on her part to evade a full disclosure of all the facts leading up to the transaction against which the bill is leveled. Her evidence impresses one with the fact that she was an old lady whose mind and memory had been impaired by the ravages of disease and the toll exacted by her advanced years. From her testimony it appears that about the last of February or first of March, 1933, Lareau and Alcott called on her at her hotel and there broached to her the subject of exchanging her home for other property, telling her they could exchange it for a business building located at the corner of Lake street and Galena boulevard, the monthly rental income of which was $105. In consulting with Knight about the trade he advised her to

make the exchange, telling her he had had the property examined, that the building was in good condition, profitably rented and would carry itself, with possibly a difference of $15 one way or the other. He was mistaken in this, for he did not have the building examined nor the rents investigated until after the property had been conveyed to her. Lareau and Alcott made several calls upon Mrs. Page at her hotel before the contract for the exchange of the property was signed. This contract bears date of March 2. Mrs. Page testified she had no recollection of any such contract. No copy of it was left with her, nor, so far as the evidence shows, was the original copy placed in escrow for the benefit of the parties thereto. Lareau told her that she had not signed any contract. Knight also told her she had signed no contract, and we are not favored by any testimony in the record as to when and under whose direction the contract for the exchange of property was prepared, who prepared it, when it was executed, nor who was then present. Lareau and Alcott represented the Golden property to her as very valuable—worth $15,000—and that an oil company would buy it at that price. Mrs. Page said that Lareau pointed out the building to her from her hotel room, and that she always understood, until a short time before the present bill was filed, that she was getting the entire building. A photograph of the structure is in evidence. It shows a two-story brick building with two business rooms on the ground floor—one on each side of a central stairway. The second story is identical in type of architecture and construction, with nothing to disclose that it was not a complete unit rather than two separate business properties. Each of the business rooms carries signs on the plate-glass windows. The inside, or west, room bears the sign "Dawn Lunch" and "Dawn Donuts" on its two front windows.

Clayton A. Day, who for seven years immediately prior to about 1931-1932 had roomed in the Page property and

thereafter had kept in touch with Mrs. Page, testified that some time during the first part of March, 1933, he was in Mrs. Page's room at the hotel on an occasion when Lareau and Alcott were there. Mrs. Page, Lareau and Alcott discussed the proposed trade in his presence. In the course of the conversation the statement was made by Alcott and Lareau that the rents on the property amounted to $105 monthly and that the Dawn Donut Company was slightly in arrears in the rent. They also made the statement that the bank had suggested the trade be made—that they had talked with Knight about the matter and were making the trade in the interest of Mrs. Page. Shortly following this conversation, Day testified, he met Knight, talked to him about the contemplated deal, and that Knight said it was a good deal for Mrs. Page. Day told him that he understood, in talking to Lareau, that the Dawn Donut Company was in arrears in its rent. Knight said he thought so, but the company was getting its business back and everything would be in good shape; that Mrs. Page had a millstone about her neck, and if she made the exchange she would be better off. The evidence shows that the Golden property was the east half of the building, and that the frontage of the entire building was about forty-five feet.

During the negotiations Lareau asked Mrs. Page who her lawyer was. She said she had none but if she had need for one she would employ Judge Olney Allen. Later, Lareau and Alcott brought to Judge Allen, at his office in Aurora, the abstract of title for the Golden property and said Mrs. Page wanted him to examine it. Judge Allen replied that she had said nothing to him on that subject and that he was not acquainted with her. Alcott then told him Knight was interested in the matter, whereupon Judge Allen called Knight, and he instructed Judge Allen to examine the abstract.

The evidence shows the property had a monthly rental income of from $93 to $95. The Golden property was en-

cumbered by a trust deed to the Merchants National Bank securing a series of notes aggregating $10,000, bearing six and a half per cent annual interest. The father and sister of Knight each owned one of these notes. Knight, however, testified that at the time of the transaction he did not know of this ownership. At the time of the conveyance of the Golden property the taxes thereon for 1931 and 1932 were unpaid and the interest maturing March 1, 1933, on the trust deed indebtedness was in default. Subsequently the bank paid out of Mrs. Page's account these items in arrears, amounting to $1241.70.

The deed from Mrs. Page to Keeves was dated and executed March 22, 1933, but the record does not reveal the circumstances under which the deeds for the respective properties were exchanged. The evidence shows that Golden acquired his business property in 1932 subject to the $10,000 encumbrance, giving in exchange 9000 shares of stock in an oil company, having no market value; that shortly after acquiring title Golden transferred such real estate to his brother-in-law, Keeves, not for value but for the convenience of Golden; that Golden thereafter at all times managed the property and collected the rents until the transfer to Mrs. Page, after which the bank collected the rents.

Several witnesses for the complainant testified she had been in ill-health for about five years prior to the time of making her deed, and that while at times she seemed in fairly good health for her years, she had had a serious illness in 1929-1930 and was under the care of a trained nurse for over a year. Later she was again ill on different occasions and under a nurse's charge. In February and March, 1933, she was in poor health and on occasions unable to go out for her meals. She was very nervous. During a considerable period immediately prior to the date here under investigation Mrs. Page seemed at times to be confused and dazed and her conversations disconnected and lacking

continuity. Eight witnesses testified on this subject for the complainant. Two testified that in their opinion she was mentally unable to transact ordinary business. Her attending physician, who was a director in the bank, was called as a witness by the defendants. He testified that she discussed the proposed trade with him in February, 1933, but he gave her no advice on the subject. He further testified that on several occasions she was seriously ill and he did not expect her to live; that on occasions when he saw her in March, 1933, she was highly nervous, distressed and worried, and that he was unable to tell whether she could intelligently protect herself in a business transaction without the aid of some other person. Two witnesses on the part of the defendants testified that, so far as they could observe, her conversation was rational and she understood business transactions.

The evidence shows that Golden paid the realtors $800 for their services in making the trade, and the bank also paid them approximately $200 commission out of Mrs. Page's account. Judge Allen testified that Alcott and Lareau requested him to represent Mrs. Page in the trade but that he refused to do so. Knight testified that he consulted Judge Allen at his office as to the advisability of the trade with reference to Mrs. Page and purported to detail a conversation with him. Judge Allen emphatically denied this conversation and stated Knight never was in his office.

Six qualified witnesses testified for the complainant on the value of the respective properties at the time of the purported exchange. The values as fixed by them ranged from $6000 to $14,000 for the Page property and from $6500 to $9000 for the Golden property. Two apparently qualified witnesses testified for the defendants as to the value of the Golden property and fixed its value at $15,000. One stated he arrived at that value upon the income basis, calculating the net income over a period of years from 1923-1933. Only one witness for the defendants expressed

an opinion as to the value of the Page property, which he placed at $8800.

The only defendant who testified was Golden. He was not called by the defendants but by the complainant. He testified upon the subject of his purchase of the property in March, 1932, that Keeves was simply a holder of the property for convenience; that the real title was still in Golden and that he collected the rents therefrom; that he received the down-cash payment made by Mrs. Burns, together with such installments as had since been paid, and that he had agreed to pay Alcott and Lareau $800 commission for making the trade with Mrs. Page. He also testified to the default in payment of the taxes and interest on the Golden property.

The trial judge saw and heard the witnesses in this cause testify. By reason of that fact better opportunity was afforded him to determine the credibility of the testimony of the witnesses than is given a court of review by a mere reading of the record. When the witnesses testify before the chancellor the reviewing court should not disturb his finding of the facts unless clearly erroneous. (*Roche* v. *Roche,* 286 Ill. 336.) The trial judge found that as of the date of exchange of the property the market value of the Golden property did not exceed the amount of the $10,000 mortgage, and that the value of the Page property was $6000. From the evidence he might well have determined the market value of the Page property at a substantial sum in excess of $6000, and as we view the record the court's finding as to its value was quite charitable to the defendants.

There is positive evidence of misrepresentation respecting the rents the Golden premises were producing at the time of the trade, also statements made by the brokers, ostensibly acting for Mrs. Page, which were well calculated to cause her to believe that she was getting the title to the whole building, when, in fact, they knew she was obtaining

the equity to the east half, only; also statements attributed to the brokers relative to the Golden property, which, while possibly only expressions of opinion, yet under the situation nere, where the brokers were representing themselves as acting for Mrs. Page's best interest and having in view her age and mental condition, were readily capable of deceiving her as to its market value. It is quite evident that she relied upon their statements and was deceived thereby.

We are deeply impressed in this connection with the fact that neither Lareau nor Alcott testified upon the subject of the statements attributed to them as being made to Mrs. Page with reference to the Golden property and as to her physical or mental condition on the days they saw her prior to and on the day of making the exchange of the properties here involved. It is a rule of law that where facts material to the issues are within the knowledge of a party to the cause and opportunity is afforded such party for the disclosure of such facts but is not availed of, a presumption arises that such evidence, if given, would have been unfavorable to him. (*Central Stock Exchange* v. *Board of Trade,* 196 Ill. 396, 407.) The courts have consistently refrained from giving a definition applicable to all cases where mental weakness was present as to the degree required to exist in order to void a contract or deed. While the mental weakness of one party to a transaction is not of itself sufficient to avoid the transaction, yet where there exists a lack of business experience, coupled with inadequacy of price, and with proof of the stress of financial necessity and intentional concealment of pertinent facts or misrepresentation, the contract or deed of the property procured under such situation will not be sustained. *Hinkley* v. *Wynkoop,* 305 Ill. 115.

The consideration received for her property by Mrs. Page was pitifully inadequate. In fact, she received nothing of value. While mere inadequacy of price, in the absence of other facts tending to show fraud or unconscion-

able advantage taken, is ordinarily not sufficient to justify the setting aside of a contract or deed, yet such consideration may be so inadequate as to amount to proof of fraud. Particularly is this true where such meagre consideration is joined with circumstances showing oppression, or that through age, weakness or mental weakness the grantor did not fully comprehend his act and was thereby led into an improvident bargain. (*Fecht* v. *Freeman,* 251 Ill. 84, 105; *Walker* v. *Shepard,* 210 id. 100; *Hardy* v. *Dyas,* 203 id. 211; *Witherwax* v. *Riddle,* 121 id. 140; *Dillman* v. *Nadelhoffer,* 119 id. 567.) In this case Golden does not deny he authorized false representations to be made or statements which led Mrs. Page to believe that she was acquiring the title to the whole building. Where one assists in the commission of a wrongful act against another, or with knowledge approves of it after it is done, if done for his benefit, and he avails himself of the fruits of such improper conduct, he is liable in the same manner as if he himself had committed the same wrongful act. *Miller* v. *John,* 208 Ill. 173, 178.

Lastly, it is earnestly urged because under the contract Mrs. Page reserved the flower plants and a small elm tree and told Knight she had the right to remove the same, that this is conclusive evidence she understood the contract and possessed mental capacity. We do not agree with that conclusion. Such reservations, under the evidence, may well be attributed to a childish mind, concerned with property of sentimental value while forgetting or not comprehending the stern realities of a contract as applied to property of substantial intrinsic worth.

The decree of the circuit court was in accordance with the law and the facts and is affirmed. *Decree affirmed.*