Estate of Max Liebling, Incompetent.
Jeanne Gardner, Plaintiff-Appellee, v. Max Liebling, Defendant-Appellant.

Gen. No. 69–61.

Second District.

January 6, 1970.

Rehearing denied February 5, 1970.

tal well-being of respondent (Supreme Court Rule 215(d)(2); Ill Rev Stats 1967, c 3, § 112).

Alvin Liebling, of Rockford, for appellant.

Russell J. Goldman and Roald A. Jacobsen, of Rockford, and William Sulkin, of Chicago, for appellee.

MR. JUSTICE DAVIS delivered the opinion of the court.

The petitioner, Jeanne Gardner, filed a petition in June of 1968 praying that her father, Max Liebling, be declared incompetent and incapable of managing his estate and person, and asking that a conservator be appointed. After extended hearings, the trial court granted the petition and ordered the appointment of a conservator.

The respondent, Max Liebling, appealed from the order and alleges that it was contrary to the manifest weight of the evidence; that the trial court erred in calling Dr. Robert Henry, a psychiatrist, under Supreme Court Rule 215(d)(2), (Ill Rev Stats 1967, c 110A, par 215(d)(2)), and in giving undue weight to his testimony; and that this proceeding was brought in bad faith.

In our opinion, the finding of the trial court was not contrary to the manifest weight of the evidence. Twelve witnesses—including three doctors, four nurses, employees, business associates, a lawyer, and a trust officer—testified at length on the issue of the competency of the respondent.

Dr. John Berry had treated the respondent since 1963, and had seen him on numerous occasions, including weekly visits during the early summer of 1968. He testified that he believed that the respondent had suffered a

stroke during the year 1966, and several small strokes since. In April of 1968, during the absence of Dr. Berry from the city, the respondent suffered another stroke—a cerebral thrombosis. Upon his return, Dr. Berry treated the respondent in the hospital and released him to his home on April 20, 1968. The respondent had to be attended by nurses around the clock for approximately a two-month period following the hospitalization. Dr. Berry testified that the respondent was suffering from generalized arteriosclerosis and controlled diabetes.

The overall result of this illness, according to the testimony of Dr. Berry, would be a general slowing down of the respondent, with additional stresses during rather hot and cold weather, at which times he would be apt to be more forgetful. In answer to the question propounded on direct examination, of whether he thought the respondent was competent to manage his business and affairs, the witness answered that he thought the respondent was competent, but he didn't know much about his business and affairs.

Dr. Berry also testified that the respondent would probably again suffer a cerebral thrombosis; that excitement, worry and aggravation might be factors which could cause such an attack; and that there are certain periods of time when the respondent would be forgetful and that during these periods, which could occur frequently, the respondent would not be competent to manage his estate. At the time of his testimony in June of 1968, the witness was of the opinion that the respondent should have someone to care for him twenty-four hours a day; that he thought the respondent was competent when he examined him, but he added, ". . . I think he has lapses of memory, but as far as full competency is concerned, I don't know." In answer to a question from the court, the witness testified that he didn't think the respondent was able to handle his business in the same way

that any reasonable, prudent man would handle his own business.

Dr. Perry A. Anderson testified at the hearings in both June and September of 1968. He stated that he cared for the respondent while he was Dr. Berry's patient in the month of April, 1968, from the time the respondent suffered his stroke until the time Dr. Berry returned to Rockford, and from July 1, until the time of his testimony in September, while Dr. Berry was out of the country. He testified that the cerebral thrombosis suffered by the respondent in April was a slight attack, and that the respondent experienced high blood pressure, general arteriosclerosis and diabetes. In June, he testified that it seemed possible that the respondent was capable of handling his business affairs, and he reaffirmed this opinion in his testimony in September.

Three of the four nurses who cared for the respondent around-the-clock at his home during April, May and June of 1968, testified that the respondent was not capable of handling his estate. Among their observations on which they based their opinion were the following: The respondent, shortly after his son, Alvin Liebling, would leave his house, would forget that Alvin had been there; that on occasions when he apparently knew he was in his home, he did not know where various rooms were; and that while riding in a car in an area not far from his home in Rockford, he thought he was in Beloit, Wisconsin. These witnesses testified generally that the respondent was confused and suffered substantial memory difficulties.

A trust officer, who had known the respondent for a number of years and had seen the respondent on two occasions during the months of May and June 1968, testified regarding the respondent's execution of certain documents on these two occasions, and his observations leading to the conclusion that the respondent was competent.

463

The lawyer, who had prepared one of the documents—a trust agreement—, and was present with the respondent only in June of 1968 when the document was signed by the respondent, was also of the opinion that he was then competent, knew what he was doing, and was capable of managing his estate. However, all information with reference to the terms of the agreement had been furnished to the lawyer by Alvin Liebling, who told the lawyer that his father was suffering from a cardiac physical impairment. Neither the trust officer nor the lawyer had knowledge of the nature and extent of Max Liebling's illness.

In September, 1968, an accountant, who had worked for the respondent for approximately fifty years, testified as to her observations of the respondent over these years, including the recent months. Following the stroke in April, she had seen the respondent once in June and once in September and she was of the opinion that the respondent was capable of handling his ordinary business affairs. Thus, like the trust officer, she had seen the respondent only twice during this period.

One of the respondent's nurses testified that she was of the opinion that the respondent was competent. Unlike virtually every other witness—whether they were longtime business associates or nurses who had known the respondent only since April of 1968, all of whom had found the respondent to be a man of few words—she found the respondent a talkative person.

Another witness was a business acquaintance of the respondent who lived in Hinsdale, Illinois. He testified that he consulted with the respondent in regard to the construction of a motel which the respondent had previously undertaken; that he came to Rockford nearly every weekend during the two-year period commencing in July, 1966, and saw the respondent on virtually all of these trips and discussed the project with him; that the respondent took an active part in all of these discus-

sions; and that his memory was good and he was capable of managing his ordinary business and affairs as a prudent man.

At the conclusion of most of the testimony, the trial court ordered that Dr. Robert Henry, a psychiatrist, examine the witness, report, and testify pursuant to Supreme Court Rule 215(d)(2). Dr. Henry testified as to the various tests given by him to the respondent on the one occasion that he saw him, and as to the conclusions he drew. He stated that the respondent was unable to answer certain types of questions, indicating to the witness that the respondent was suffering from a severe organic brain syndrome; that he was not suffering from any psychosis; and that the condition, as he, the psychiatrist observed it, was progressive and irreversible. It was his opinion that the respondent was not capable of handling his estate.

 We note that neither Max Liebling, Leona Liebling, his wife, nor Dorothy Smith, his youngest daughter, testified in this proceeding. All of these parties were represented in the litigation by Alvin Liebling, as one of their attorneys. It is a rule of law that where facts material to the issues are within the knowledge of a party to the cause and the opportunity is afforded such party for the disclosure of such facts but is not availed of, a presumption arises that such evidence, if given, would have been unfavorable to him. Page v. Keeves, 362 Ill 64, 73, 199 NE 131 (1935).

 The foregoing is not an exhaustive recitation of the testimony that was before the trial court. It is merely a summary; however, we believe it sufficient to indicate that there was an abundance of evidentiary support for the findings of the trial court. We see no purpose in detailing all of the testimony of the various witnesses. The evidence before the trial court was conflicting, but the court had the opportunity to observe the witnesses and determine their credibility and the weight to be

465

given their testimony. We have reviewed the entire record in detail and are of the opinion that the findings of the trial court are not manifestly against the weight of the evidence. Anderson v. Long Grove Country Club Estates, 111 Ill App2d 127, 139, 249 NE2d 343 (1969); Sudduth v. Board of Fire and Police Com'rs of City of Rockford, 48 Ill App2d 194, 208, 198 NE2d 705 (1964); Rude v. Seibert, 22 Ill App2d 477, 483, 161 NE2d 39 (1959).

■ ■ With regard to the propriety of the court in calling Dr. Henry to testify under Supreme Court Rule 215(d)(2): The rule is designed to aid the trial court in making a just determination of a medical issue, when in the opinion of the court a physical or mental examination is necessary. Once the trial has commenced, the court may exercise its discretion to order an impartial examination if it finds there are compelling considerations. Two factors are important in this case. First, this matter was being tried without a jury, and the hearings were held over an extended period of time. The first was held in June and the next in September, during which time the court determined to seek an impartial medical report. The doctor's testimony was taken on October 4, 1968, at the same time as that of another witness for the respondent who could not be present at the September hearing. This circumstance caused no substantial inconvenience to the litigants; it did not have the effect of delaying a determination until the testimony of the doctor could be taken. The matter had to be continued for the testimony of the additional witness of the respondent. Second, the testimony as to the capability of the respondent to manage his estate was not without conflict. The doctors, who had testified, were somewhat self-contradictory in their testimony. The determination which the trial court was called upon to make was significant: the sole issue related to the physical or mental well-being of the respondent. We believe

466

that the conflicting evidence on the issue before the court was the compelling reason for ordering the additional examination in this case, and that the doctor's testimony was properly considered by the court.

The respondent further alleges that the petition was brought in bad faith, not to conserve his, the respondent's estate, but to thwart his wishes as to the manner in which his estate should be managed. Our determination that the finding of the trial court is supported by the evidence is sufficient answer to this allegation. The respondent himself was not aware of these proceedings, and, apparently, is not now aware of them. We do not regard this proceeding as one wherein there was conflict and discord between Max Liebling and any member of his family, rather, the basis for the litigation was the dispute between the members of his family with reference to what was the appropriate manner of managing his estate. While there is a difference of opinion on this matter among the family members, it does not appear that any member has acted in bad faith.

Under the provisions of section 112 of the Probate Act (Ill Rev Stats 1967, c 3, par 112), an incompetent is defined as follows:

> "An 'incompetent' under this Act includes any person who because of insanity, mental illness, mental retardation, old age, physical incapacity, or imperfection or deterioration of mentality, is incapable of managing his person or estate and any person who, because of gambling, idleness, debauchery or the excessive use of intoxicants or drugs, so spends or wastes his estate as to expose himself or his family to want or suffering."

This definition is very broad and includes any person, who, because of any of the conditions there set forth, is incapable of managing his person or estate. Under the evidence in this case, and under applicable law, the trial

467

court did not err in its finding that Max Liebling was incompetent.

For the reasons stated herein, the judgment of the trial court is affirmed.

Judgment affirmed.

MORAN, P. J. and ABRAHAMSON, J., concur.